NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

GULF–WAÑDES CORPORATION,
Respondent.

No. 78–1644.

United States Court of Appeals,
Fifth Circuit.

May 24, 1979.

Elliott Moore, Deputy Assoc. Gen. Counsel, John G. Elligers, Atty., Christopher W. Katzenbach, Atty., John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Assoc. Gen. Counsel, N.L.R.B., Washington, D.C., for petitioner.

Thomas A. Beckley, Harrisburg, Pa., for respondent.

Charles M. Paschal, Jr., Director Region 15, N.L.R.B., New Orleans, La., for other interested party.

Before GEWIN, HILL and FAY, Circuit Judges.

GEWIN, Circuit Judge:

The National Labor Relations Board seeks enforcement of its order finding four distinct violations by respondent Gulf-Wandes of § 8 of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) and (3). The petition is enforced in part and denied in part.

As the result of a proper election, the Oil, Chemical and Atomic Workers International Union (the Union) was certified in April 1976 as the exclusive bargaining representative of respondent's sixty maintenance and production employees. The unit or "group" of employees thereafter elected Andrew Crawford chairman of its three-person workmen's committee. That position accorded him responsibility to coordinate with the Union as to all contract negotiations with the company.

In July 1976 the committee and Union representative James Riley began negotiating a new contract with Gulf-Wandes. Over the course of the next three months several proposed contracts were agreed upon, but each was rejected by the employees. Following the latest rejection in early October 1976, Riley recommended to the committee that some type of job action should be taken to demonstrate to respondent the employees' solidarity. The workmen's committee accepted the idea and decided the appropriate action would be a concerted refusal to work overtime on Sat-

urday, October 23.[1] During the week prior to the 23rd, Crawford and the other committee members talked individually to employees, urging them to refuse any company requests that they work overtime on that Saturday. Crawford also held three meetings, one on Thursday and two on Friday, at which he implored the employees present to decline to work overtime on the 23rd. At a Thursday meeting the 20–25 employees present voted unanimously to refuse overtime. At the three meetings Crawford pledged that if any employees were discharged for refusing to work on Saturday, October 23, the other union members would strike on their behalf.

On Friday afternoon assistant foreman John Aucoin called employee William Bell to his desk and asked his opinion of the strikes. When Bell replied that he did not like strikes, Aucoin responded "that's good, because just between you and me, anyone that doesn't cross the picket line doesn't have a job."

That same day foreman George Bickham determined he needed nine employees to work overtime on Saturday in order to complete a particular job. As was customary practice, he initially requested the nine employees then working on that assignment to report Saturday. All nine employees, six of whom were union members, stated their preference not to work that day. Bickham searched without success for other volunteers and then returned and instructed the employees to report the following day. Though the six union members had agreed not to report on Saturday in accordance with the job action, they did not reply to Bickham's order.[2]

On Saturday, October 23, the six employees did not appear for work. In response, Bickham and superintendent Grenat met that day and decided to fire them. As the six returned to work on Monday morning, October 25, Bickham informed each man that he was being terminated and instructed him to "turn in his tools."[3]

Arriving shortly thereafter at the plant, Crawford learned of the firings and went to Bickham to protest. Bickham refused to discuss the matter. Crawford then sought out Grenat who told Crawford that he did not have to talk to him about the discharge as they "were none of [Crawford's] business." Crawford accused Grenat of discharging the employees because of their "union participation" and stated that he was calling a strike on their behalf. Grenat responded "I did what I had to do, you do what you have to do."

Crawford immediately informed the other employees that they were on strike and over thirty left the plant and set up a picket line in the street. The strike continued until November 15 when the employees voted to end it. Riley and Crawford delivered to the company letters on behalf of the striking employees, offering an unconditional return to work.[4] Respondent accepted the offers except as to the six union members discharged on October 25, but refused to immediately reinstate the strikers. All of the employees except the six and employee Woodrow Boatner were gradually reinstated over the following two months. Following the strike's conclusion, negotiations resumed, resulting in a contract on January 27, 1977.

1. This form of concerted activity was selected because the company's requirements as to overtime had been challenged repeatedly by the employees during the contract negotiations.

2. Bickham inadvertently failed to inform Donnie Hallmark, one of the six union members, that he was to report on the 23rd. Having assented to the Union plan to refuse overtime, Hallmark did not report on Saturday and was discharged with the five other employees on Monday, October 25.

3. There was a substantial dispute between the parties over whether Bickham afforded the employees an opportunity to explain their Saturday absences. The employees testified that Bickham fired them summarily without explanation and without giving them an opportunity to respond. Superintendent Grenat and Bickham testified that the employees were given such an opportunity but offered no excuses for their absence.

4. In addition some twenty-six of the strikers personally delivered to company Controller Piatt individual letters offering an unconditional return.

Employee Boatner, a union member, was not restored to employment because of his alleged insubordination which occurred on October 22, prior to the concerted job action and subsequent strike. On that day Boatner was circulating a football pool when he was supposed to be assisting in the loading of a truck. His supervisor, Jackson, reprimanded Boatner and an argument ensued, during which Boatner called Jackson a "god-damned liar." Though he had authority to fire Boatner immediately, Jackson decided, because of his newness to the supervisory position, to first confer with his superiors. On Monday morning, October 25, prior to the walkout, he reported the incident to controller Piatt. Piatt authorized Jackson to fire Boatner for insubordination. Nothing, however, was communicated to Boatner and he went out on strike with the other employees. During the strike he received no termination notice and when, on November 15, he personally extended his offer to return to work, it was accepted. Two weeks later, on December 1, when the occasion arose for Gulf-Wandes to reinstate Boatner, he received a letter discharging him for insubordination, effective October 23.

In his decision the Administrative Law Judge determined the company discharged the six employees on October 25 for protected activity, a violation of § 8(a)(3) and (1). He further found that the subsequent strike was an unfair labor practice strike because it occurred in response to the unlawful discharge of the six employees. Therefore, the company's refusal to immediately reinstate the striking employees, upon their unconditional request on November 15 to return to work, contravened § 8(a)(3) and (1). In addition, the Administrative Law Judge found that Aucoin coercively interrogated and threatened Bell on October 22 in violation of § 8(a)(1). Finally, he concluded that Boatner was discharged for cause and not for union activity.

On review the NLRB agreed with the findings except as to Boatner. The Board concluded with one member dissenting that he was terminated on December 1 because of his participation in the strike in violation of § 8(a)(1) and (3). In accordance with these findings, Gulf-Wandes was ordered to cease and desist from such practice, post appropriate notices, reinstate the seven employees to their former positions and to make them whole for any losses suffered.

The Board's order is fully subject to appellate review. The scope of review, however, is limited. This court is compelled to sustain the Board's determination with respect to questions of fact if, upon consideration of the record as a whole, the findings are supported by substantial evidence. *Allied Chemical & Alkali Workers v. P.P.G.*, 404 U.S. 157, 171, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971); *NLRB v. Brown*, 380 U.S. 278, 291, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965); Justice Frankfurter, writing for the majority in *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1950), defined the contours of this standard.

> "[S]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." (citation omitted) Accordingly it "must do more than create a suspicion of the existence of a fact to be established * * [I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." (citation omitted).

340 U.S. at 477, 71 S.Ct. at 459.

■ Taking in turn the four alleged violations of the Act, we must ascertain first whether there was substantial evidence to support the Board's determination that the six employees discharged on October 25 were fired for engaging in protected union activity. Section 7 of the National Labor Relations Act guarantees union members the right to engage in concerted activities for the purpose of collective bargaining, and § 8(a)(1) and (3) make it an unfair labor practice for an employer to interfere with, coerce or discriminate against employees

who elect to exercise this right.[5] This statutory protective shield extends to a single refusal to work overtime if it is a concerted activity directed at changing employee working conditions, or employer policy. *First National Bank of Omaha v. NLRB*, 413 F.2d 921, 925 (8th Cir. 1969); *see NLRB v. Lasaponara & Sons*, 541 F.2d 992, 998 (2d Cir. 1976); *Bob's Casing Crews, Inc. v. NLRB*, 458 F.2d 1301 (5th Cir. 1972).

Viewing the evidence as a whole, we believe that there was a sufficient factual basis for the Board's conclusion that the employees' refusal to work overtime on Saturday, October 23, was protected activity, and that the six were discharged for their participation in the job action. The credited evidence established that Union representative Riley recommended the refusal to work overtime as a collective means of demonstrating the employees' unified support for their contract demands. The workmen's committee accepted the idea and chairman Crawford held at least three meetings the week prior to Saturday, October 23, informing the employees of the planned concerted activity. He stated at the meetings that if any union members were fired as a result of refusing to work overtime, the others would strike. At the Thursday, October 21, meeting the 20–25 employees present voted unanimously to refuse to report on Saturday. Quite clearly the refusal to work overtime on the 23rd fell within the protective ambit of Section 7.

■ The evidence adduced below indicated further that the employees were dismissed for their concerted refusal to work overtime on the 23rd. To parry this thrust, respondent asserts two defenses. It first contends ·that the discharges were lawful because it had no knowledge of the planned refusal to work overtime or that the employees were acting in concert in failing to report on Saturday. This defense is contradicted by the record evidence.

On Friday, October 22, assistant shop foreman Aucoin asked Bell for his opinion on the impending strike and then warned him that anyone who struck would no longer have a job. Aucoin's statement was indicative of some management knowledge of the Union's plans. Wilbur Jackson, an employee who crossed the picket line, testified that during the strike superintendent Grenat told him a shop foreman, Delcort, overheard a meeting on Friday, October 22, in which the concerted activity was discussed. Shortly before one of the Friday October 22 meetings began, Delcort was seen by other witnesses entering the mat room which adjoins the lunchroom, where the meeting was held. Grenat then explained to Jackson the reason for the dismissal of the six employees, "we can't afford to have people going around and saying they can't work . . ." Jackson also discussed the discharges with company president Atkinson and he gave a similar response in reference to the six employees, "we can't have people going around telling us when they can work and when they can't."[6] When Crawford learned of the discharges on October 25, he confronted Bickham and Grenat and claimed the company had terminated the men because of their participation. Neither disputed this charge or offered an explanation for the discharges.

Furthermore, as the Administrative Law Judge noted, it is highly improbable that the Union could have held three separate employee meetings on respondent's premises, each attended by a substantial number of employees, without management learning of the occurrence and purpose of such meetings.

■ As a second defense to the discharges, Gulf-Wandes asserts that the six employees were terminated because they violated the company's longstanding "no show-

**5.** Section 7 does not protect all concerted activities. As stated by the Supreme Court in *NLRB v. Washington Aluminum Co.*, 370 U.S. 9, 17, 82 S.Ct. 1099, 1104, 8 L.Ed.2d 298 (1962), unprotected actions include "those that are un-

lawful, violent or in breach of contract" . . . or "indefensible."

**6.** Jackson's testimony was specifically credited by the Administrative Law Judge.

no report rule." Under this rule if an employee fails to report for scheduled overtime and neglects during his or her absence to call in and give an explanation, he or she is deemed to have quit. The company claims that the rule had been in effect and uniformly applied since 1965, and that the employees were fully aware of it. Respondent's written rules and regulations, however, did not include the automatic termination rule. Rather, these rules provided for a warning for "unexcused absence" and for a discharge for "three days or more absence without calling in." Moreover, at the administrative law hearing, the company presented only two cases in which the verbal rule had been applied and in these, the employee had a record of other behavior constituting grounds for dismissal. Noting the equivocal character of the evidence on the rule's existence, the Administrative Law Judge found that it is "highly unlikely that the asserted rule ever existed, at least with the Gilbrater-like aspect attributed to it by Respondent."

Yet, assuming the existence of this rule, it could not be used to justify the firings of the employees who were engaged in a protected activity. In *NLRB v. Washington Aluminum Co.*, 370 U.S. 9, 82 S.Ct. 1090, 8 L.Ed.2d 298 (1962), a company dismissed several employees who engaged in a protected walkout to protest certain plant conditions. The company asserted as cause for the discharges the union members' violation of a plant rule forbidding employees to leave work without permission. The Supreme Court rejected this rationale, holding that rules of this discretionary nature do not provide cause for disciplining employees engaged in legitimate union activity.

> An employer is [not] at liberty to punish a man by discharging him for engaging in concerted activities which § 7 of the Act protects. And the plant rule in question here purports to permit the company to do just that for it would prohibit even the most plainly protected kinds of con-

certed work stoppages until and unless the permission of the company's foreman was obtained.

370 U.S. at 16–17, 82 S.Ct. at 1104.

Likewise, respondent's rule, if it existed, would require the termination of employees involved in protected work stoppages if they failed to notify the employer during their absence of their participation in such activities or if the company in its discretion deemed this explanation unacceptable. Respondent may not invoke a rule in this fashion to punish the employees for their refusal to work overtime. The Board's findings that the employees' involvement in concerted activity occasioned their discharge were supported on the whole by substantial evidence.

▮ The second alleged violation is respondent's failure to immediately reinstate the striking employees upon their unconditional offer to return to work on November 15. The company reinstated two employees on November 16 but recalled the other strikers only as positions became available in November and December. It is a violation of § 8(a)(3) and (1) for an employer to fail to immediately reinstate to their former positions employees engaging in an unfair labor practice strike, even if replacements for them have been made. *NLRB v. International Van Lines*, 409 U.S. 48, 50–51, 93 S.Ct. 74, 34 L.Ed.2d 201 (1972) *citing Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 278, 86 S.Ct. 1862, 16 L.Ed.2d 682 (1955). An unfair labor practice strike is a strike which has as its sole or contributing cause an unfair labor practice by the employer. *NLRB v. Pope Maintenance Corp.*, 573 F.2d 898, 906 (5th Cir. 1978).

It is evident that the strike in the instant case qualified as an unfair labor practice strike, thereby entitling the employees to immediate reinstatement. The strike occurred because of the firing of the six employees which the Board correctly found to be an unfair labor practice.[7] Immediately

---

7. Respondent has alleged throughout the course of the proceedings that the sole purpose of the concerted refusal to work overtime and

the subsequent strike was to achieve recognition for Local 4–620 of the Oil, Chemical and Atomic Workers as the employees' bargaining

upon learning of the firings on Monday, October 25, Crawford confronted Plant Superintendent Grenat about the discharges. When Grenat refused to offer an explanation, Crawford informed him that he was going to call a strike because he "believed the guys had been fired or laid off because of their participation." In calling the strike, Crawford was merely fulfilling his pledge made previously at the meetings that the union members would strike if any employees were terminated for refusing to work overtime.

■ During the strike, the employees' picket signs protested "unfair labor practices" and "unfair treatment" by Gulf-Wandes. Union representative Riley informed the company that the employees would end the strike only if it restored the six discharged employees to their former positions of employment. Respondent refused and the strike continued until November 15, when the unconditional offer to return was extended. In the view of this court there was substantial evidence to support the Board's findings that respondent contravened the Act in declining to immediately reinstate the employees striking over the unfair labor practice.

■ The Board and the Administrative Law Judge also determined that assistant foreman Aucoin's questioning of employee Bell on Friday, October 22, constituted an unlawful interrogation in violation of § 8(a)(1) of the Act. Interrogation of employees violates the National Labor Relations Act only when the questioning tends to restrain, coerce or interfere with employees in the exercise of their rights under the Act. *Ridgewood Management Co. v. NLRB*, 410 F.2d 738, 740 (5th Cir. 1969) *quoting NLRB v. Sunnyland Packing Co.*, 369 F.2d 787, 793 (5th Cir. 1966). To decide whether Aucoin's statement tended to coerce, we must examine the circumstances

as a whole, considering such factors as (1) the history of the employer's conduct and attitude toward its employees; (2) the nature of the information sought; (3) the interrogator's position with the company; (4) the place and method of interrogation; and (5) the truthfulness of the employee's reply. *Florida Steel Corp. v. NLRB*, 529 F.2d 1225, 1229 (5th Cir. 1976); *NLRB v. Varo, Inc.*, 425 F.2d 293, 298 (5th Cir. 1970); *NLRB v. Camco, Inc.*, 340 F.2d 803, 804 (5th Cir. 1965).

■ Weighing the circumstances we believe Aucoin's conversation with Bell, a union member, was of a coercive and threatening nature. Without offering an explanation Aucion summoned Bell to his office and asked his opinion of the possible strike. When Bell expressed negative feelings in general about strikes, the assistant foreman replied, "that's good because just between you and me, anyone that doesn't cross the picket line doesn't have a job." This comment clearly implied that respondent would retaliate against workers who participated in the planned job action.[8] This not-so-veiled warning would tend to intimidate and coerce employees and we agree with the Board and the Administrative Law Judge that it was proscribed by the Act.

■ The final asserted violation which we must address is the discharge of Boatner. As stated above, the Administrative Law Judge concluded that Boatner was properly discharged for insubordination arising from neglect of his duties and his argument with supervisor Jackson on October 22 in which he called his supervisor a "god-damn liar." At the administrative law hearing, Superintendent Piatt testified that he mailed a termination letter to Boatner on October 25 which was returned undelivered. Although Piatt testified that he had a copy of the letter, he never produced it at the hearing. Neither was a copy

---

representative. We agree with the Administrative Law Judge and the Board that this assertion is without merit.

**8.** Bell interpreted the remark as directed at the planned refusal to work overtime.

[T]he way I took it, he was talking about the Saturday work, because you know, everyone knew that no one was going to work Saturday, and if they—if someone got fired, we were going on strike. (R. 244).

found in Boatner's personnel file though a copy of the December 1 termination letter was located therein. For these reasons, the Administrative Law Judge effectively discredited Piatt's testimony as to the alleged letter. Nevertheless, he found that Piatt probably forgot about Boatner's misconduct during the turmoil of the strike and that this preoccupation delayed the legitimate discharge.

Disagreeing with the Administrative Law Judge, the Board found that the almost six week delay between Boatner's insubordinate act and his termination established that the company's hostility to Boatner's participation in the intervening strike motivated the dismissal. Under this reasoning, the insubordination ground was a mere pretext for union animus.

We are convinced that the Board's conclusion on this point must fall for lack of substantial evidence.[9] The facts on record clearly established that Boatner was guilty of insubordinate conduct on October 22 and that Jackson obtained permission on October 25, before the strike, to dismiss the recalcitrant employee. The testimony of both Piatt and Jackson to this fact were credited. At the same time, the Board inferred an impermissible motive largely from the company's attitude and conduct toward the other striking employees and the failure of the respondent to terminate Boatner sooner. We agree with respondent, however, that to have fired Boatner while he was on the picket line would have engendered protests that the discharge was based on his union activity.

Moreover, the remoteness in time between the October 22 incident and the discharge did not, alone, demonstrate union animus. In short there simply was insufficient evidence from which to infer that Boatner's active participation in the strike was the sole cause or a contributing factor in his discharge. The Administrative Law Judge's finding that Boatner was dismissed for cause was proper and in accordance with our decisions on employee misconduct.[10] See, e. g., NLRB v. Soft Water Laundry, Inc., 346 F.2d 930, 934 (5th Cir. 1965); NLRB v. R. C. Can Co., 340 F.2d 433, 435–36 (5th Cir. 1965).

This court's finding that Boatner's discharge was justified may seem a Pyrrhic victory for respondent, since the Board's order was otherwise supported by substantial evidence. It is nonetheless a judgment to which the company is entitled. The Board's order is therefore enforced in part and denied in part.

ENFORCED IN PART and DENIED IN PART.

---

9. For this reason Board member Murphy dissented from the majority's findings on Boatner.

We derived our conclusion that the Board's evidence was insubstantial from careful scrutiny of the entire record, including that evidence opposed to the Board's decision. This scrupulous examination is an essential element of the substantial evidence standard of review. As the Supreme Court in *Universal Camera Corp.* stated:

Whether or not it was ever permissible for courts to determine the substantiality of evidence supporting a Labor Board decision merely on the basis of evidence which in and of itself justified it, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn, the new legislation definitely precludes such a theory of review and bars its practice. The substantiality of evidence must take into account whatever in the record fairly detracts from its weight. This is clearly the significance of the requirement in both statutes that courts consider the whole record.

340 U.S. at 487–88, 71 S.Ct. at 464.

10. As a striking employee, Boatner was entitled to return to work on November 15, 1976 and work until his lawful discharge on December 1. Hence, he should receive backpay for this period, as the Administrative Law Judge so found.