NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

SOUTHERN PLASMA CORP., Respondent.

No. 79–2970.

United States Court of Appeals, Fifth Circuit.

Oct. 2, 1980.

Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., L. Joseph Ferrara, Washington, D. C., for petitioner.

Huey, Camper & Guilday, Thomas J. Guilday, Tallahassee, Fla., for respondent.

Before KRAVITCH, HENDERSON and REAVLEY, Circuit Judges.

HENDERSON, Circuit Judge:

The National Labor Relations Board (hereinafter referred to as the "Board") petitions for enforcement of its order finding Southern Plasma Corporation (hereinafter referred to as "Southern Plasma") in violation of §§ 8(a)(1) and 8(a)(3) of the National Labor Relations Act, 29 U.S.C.A. §§ 158 (a)(1), (3) (hereinafter referred to as the "Act"), and directing reinstatement and backpay for certain former employees.

Southern Plasma produces and distributes blood plasma. The company is divided into sections according to function. The "front office" or "processing room" employees per-

form the initial screening of blood donors. Blood is actually drawn by a different group of employees who work in the "donor room". A third division of employees process antibodies from donors with rare blood types in the "antibody lab". In making its decision, the Board adopted, with a minor modification not important here, the findings of fact and conclusions of law entered by the Administrative Law Judge (hereinafter referred to as the "ALJ") after a hearing during which both sides presented evidence and argument. Our reference to the facts comes from the evidence presented at that hearing and the ALJ's findings.

Harry Gurley, the owner of Southern Plasma, instructed his lab manager, Valaree Peck, to distribute a non-competition agreement (hereinafter referred to as the "Gurley contract") to all employees, directing that they denote their acceptance thereof by their signatures. Because some of the employees felt the Gurley contract impinged too greatly on their freedom to work for others in the future, they resolved to consult a lawyer for advice. Pursuant to this plan, Patricia Mobley, Melanie Parker and Glenda Baker met with an attorney on the morning of September 2, 1977. With his aid, they formed the Southern Plasma Employees Association (hereinafter referred to as the "Association") and prepared for signature by other employees a petition authorizing the Association to represent them in collective bargaining. They also drafted a counter-proposal (hereinafter referred to as the "alternative contract") to the Gurley contract, which contained less restrictive non-competition provisions. Mobley, Baker and Parker returned to Southern Plasma, where they obtained the signatures of five additional employees on the Association's petition and the signatures of all employees, save one, of the donor lab and front office on the alternative contracts.[1]

At lunch on that same day, Mobley, Parker and Baker presented lab manager Peck with the alternative contracts and their bargaining demand. Peck expressed confusion and they explained further that they had formed a union and wanted to bargain collectively with Gurley. Peck then called Gurley and informed him that the employees had prepared a counter-proposal to his non-competition agreement. Gurley told Peck to come over to his office. Mobley accompanied Peck and, upon their arrival, Mobley presented Gurley with the stack of signed alternative contracts, told him that the employees had formed a union, and asked him to read their proposal. With this confrontation, Gurley became angry, threw the alternative contracts across his office, and exclaimed he did not have to deal with any union and that he would close the lab first. He repeated this later in their conversation.[2] This was Gurley's only reference to the union during the entire September 2nd incident. Mobley explained to Gurley that what the employees really wanted was an explanation of his non-competition contract. Gurley responded that he had a manager, Peck, for that purpose, and initially refused to meet with the employees. Mobley succeeded in persuading him to discuss the problem with the employees and a short time later they all gathered for a meeting at the lab. At that time, Gurley explained that he needed more security, in

1. All front office employees except Debi Blanchard (Melanie Parker, Betty Lockwood, Karen Amodio and Joanne Godwin), all donor room employees (Glenda Baker, Dennis Huguley, Abigail Williams and Calvin Thomas), and the assistant lab manager (Patricia Mobley) signed the alternative contract. The same employees, other than Joanne Godwin, signed the Association's petition. The lab manager (Valaree Peck), the antibody lab workers (Robert Dator, Lynn Jones and Debra Powell) and one front office employee (Debi Blanchard) accepted the Gurley contract and refused to sign the Association's petition.

2. Gurley denied that there was any mention of the union, and maintained that his anger was aroused by the employees' counter-proposal to his non-competition contract. Peck also denied hearing Gurley say anything about a union. The ALJ's conclusion that Gurley did disparage the union at the office meeting was based on his preference for Mobley's credibility, a choice which we cannot find should be overturned. Thus, we accept as an established fact that Gurley's behavior was as Mobley described it.

the form of assurance that none of his employees would divulge the names of his valuable rare blood donors to competitors. He also announced that the lab was closed and that the employees had brought the closing on themselves. One donor lab employee, Dennis Huguley, argued with Gurley over the consideration claimed in the Gurley contract for the employees' agreement not to compete—the specialized training given them by Southern Plasma. It was Huguley's contention that any "training" was simply the result of trial and error.

The unfruitful meeting came to an end with Gurley repeating that he was going to close the lab, and saying that he had not been making any money anyway and that he was going to get rid of the troublemakers and "potheads". The donor lab and processing room employees, except for Debi Blanchard, were terminated and the donor lab closed. The antibody lab, whose workers had signed the Gurley contract, remained open.

Six days later, on September 8th, the donor lab reopened with new employees. Calvin Thomas reapplied and was rehired. Mobley inquired about reemployment but was turned down. In November, Huguley came to the lab as a donor. Peck asked him if he would be interested in returning to his job, to which he replied affirmatively. However, upon inquiry Gurley said he would not rehire Huguley because he was a troublemaker, this assessment being based in part on Huguley's conduct at the September 2nd meeting.

The ALJ concluded, and the Board concurred, that Southern Plasma violated §§ 8(a)(1) and 8(a)(3) of the Act by closing the donor lab and then reopening it in order to foreclose the union, and that the complaint was not barred by § 10(b) of the Act. A separate violation was found in the refusal to rehire Huguley. The ALJ stated this refusal was motivated by anti-union animus prompted by Huguley's conduct at the September 2nd meeting, which the ALJ decided was protected concerted activity. Finally, the ALJ determined that Baker and Parker, even though supervisors, were entitled to reinstatement and backpay along with the rest of the former employees. See 29 U.S.C.A. § 152(3).

Section 10(b) of the Act, 29 U.S.C.A. § 160(b), provides that "no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made . . ." The charge was filed and served on March 3, 1978, six months and one day after Gurley closed the lab. Southern Plasma insists that the employees were "discharged" on September 2nd, that any violation of the Act must have occurred on that day and that the complaint is therefore time-barred. We disagree.

 In *Textile Workers Union of America v. Darlington Mfg. Co.*, 380 U.S. 263, 271–274, 85 S.Ct. 994, 1000–1001, 13 L.Ed.2d 827, 835–36 (1965), the Supreme Court made it clear that an employer may shut down his entire business even if motivated by the most egregious anti-unionism. However, the employer cannot close his business temporarily and then reopen in order to oust the union. *Id.* 380 U.S. at 271, 85 S.Ct. at 1000, 13 L.Ed.2d at 835.[3] Putting Gurley's motive aside for the moment, we have no doubt that his actions constituted a temporary closing of the processing room and donor lab, and not simply a selective discharge of employees. Gurley's own testimony belies any other characterization. He clearly stated to his employees at the September 2nd meeting that he was closing the lab. Even if he had told them that he was closing the lab because he did not care

---

**3.** The Court also held that the employer could not shut down *part* of his business, even permanently, if his motive was to chill unionism in other areas of his enterprise. *Darlington*, 380 U.S. at 274–275, 85 S.Ct. at 1001–1002, 13 L.Ed.2d at 836–37. There is no evidence here that Gurley closed the donor lab so as to dampen unionism in the antibody lab. Thus, we will treat this as a temporary closing case, and see no reason to distinguish it from those in which the temporary shutdown embraced the entire operation.

to deal with a union, at that point there would have been no violation of the Act and the employees would have been without remedy.[4] It was only on September 8th, when the donor lab and front office re-opened with new employees, that, assuming an unlawful motive, a violation of the Act occurred.[5]

 The ALJ did not separately analyze Gurley's conduct under §§ 8(a)(1) and 8(a)(3), and correctly so. Rather, once he decided that Gurley's conduct was discriminatorily motivated, he concluded that both sections were violated. Section 8(a)(1) prohibits employer conduct which interferes with employees' § 7 rights to organize and to bargain collectively. This section requires weighing the effect on employee rights against the employer's business justification for his actions; discriminatory motive need not be present. *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945). Section 8(a)(3) covers narrower ground—it proscribes "discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." Thus, an anti-union motive for the employer's action is necessary. In *Darlington*, the Court decided that closing a business is not a violation of § 8(a)(1) unless it also violates § 8(a)(3), *i. e.*, it was motivated by anti-union animus, because such decisions "are so peculiarly matters of management prerogative." *Darlington*, 380 U.S. at 269, 85 S.Ct. at 999, 13 L.Ed.2d at 833. *See* R. Gorman, *Basic Text on Labor Law* 146, 148 (1976).

Our examination of the temporary closing will focus only on § 8(a)(3).[6]

The ALJ found that the donor lab and processing room were temporarily closed "in substantial part if not entirely, because [the employees] had concertedly acted for their own mutual aid and protection and because Gurley believed that they were engaged in union activity." R. 258 (footnote omitted). He rejected Gurley's explanation that "each individual was terminated for his or her individual refusal to sign the contract" because "the facts belie this contention." R. 258.

 Because a credibility choice is involved, we must pay special deference to the ALJ's conclusion. *NLRB v. Walton Mfg. Co.*, 369 U.S. 404, 407, 82 S.Ct. 853, 855, 7 L.Ed.2d 829, 832 (1962); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 496, 71 S.Ct. 456, 468, 95 L.Ed. 456, 472 (1951). The ALJ dismissed Gurley's explanation because (1) he became very angry and threatened to close the business when Mobley presented him with the alternative contracts and told him that a union had been formed, (2) he repeated the threat when he met with the employees, (3) he gave the employees no real opportunity to sign his contract at the meeting, (4) he asserted that September 2nd was the deadline for signing the contract, which was inconsistent with the previously set September 8th date, and (5) he refused to rehire Huguley because he was a "troublemaker", which the ALJ said constituted a separate unfair labor practice.

**4.** They would have been without remedy absent the circumstances described in note 3, *supra*, which, we again emphasize, are not present here.

**5.** The ALJ held, alternatively, that because the employees could not have known the true nature of the violation until the lab reopened on September 8th, the limitations period was tolled until that date. In light of our decision that the limitations period did not commence until the violation was consummated on September 8th, this alternative holding based on equitable principles is unnecessary and we do not express any opinion as to its validity.

**6.** In his conclusions of law, the ALJ stated that "the employees were engaged in protected ac-

tivity when they acted together to formulate, present and negotiate terms less onerous than had been proposed to them in Gurley's non-competition agreement." Record (hereinafter referred to as "R."), at 258. It is true that the act of banding together and attempting to negotiate is protected union activity, and temporarily closing the lab in order to rid the business of such activity is a § 8(a)(3) violation. However, insistence on the employees signing a non-competition agreement and closing the business in order to eliminate employees who refuse to sign is *not* a violation of § 8(a)(3). *Cf.* § 8(a)(5), 29 U.S.C.A. § 158(a)(5) (refusal to bargain).

Certainly, this is ample evidence to support a conclusion that Gurley was not testifying truthfully in stating his motive for temporarily closing Southern Plasma.

■ According to this circuit's interpretation of § 8(a)(3), once the employer shows that he had a lawful, non-discriminatory motive, the burden shifts to the General Counsel to prove anti-union animus was the motivating cause. *NLRB v. Florida Steel Corp.*, 586 F.2d 436, 447–48 (5th Cir. 1978). However, in this case, the ALJ rejected, for credibility reasons, Gurley's explanation for closing the business. Thus, Southern Plasma never made a preliminary showing of a non-discriminatory motive and the burden did not shift to the General Counsel to prove that the employees would not have lost their jobs "but for" their employer's anti-union sentiments.

■ The only question remaining is whether substantial evidence in the record as a whole supports the ALJ's conclusion that anti-union animus was the motivating factor in Southern Plasma's temporary closing decision. Here, we need go no further than Gurley's own statement that he would close the business rather than deal with a union.[7] We are therefore presented with one of those rare cases in which the employer's own words are a direct, unequivocal indictment of his reasons and, consequently, we are not required to determine whether inferences of unlawful motivation drawn from the evidence are warranted. *See NLRB v. Big Three Welding Co.*, 359 F.2d 77, 80 (5th Cir. 1966). In light of Gurley's own statement, it seems almost superfluous to say that substantial evidence supports the ALJ's conclusion that the employees were terminated because of their union activities.

■ The ALJ also ordered reinstatement and backpay for supervisors Baker and Parker because their termination was "an integral part of a pattern of conduct aimed at penalizing employees" for their organizational activity. We regard this conclusion as a disturbing and unwarranted erosion of the Congressional mandate to exclude supervisors from the Act's protection.

■ Through §§ 2(3), 2(11) and 14(a) of the Act, 29 U.S.C.A. §§ 152(3), 152(11), 164(a), Congress excluded supervisors from the protection afforded rank-and-file employees who engage in concerted activity for their mutual benefit. Its purpose was to assure management of the undivided loyalty of its supervisory personnel by making sure that no employer would have to retain as its agent one who is obligated to the union. *Florida Power & Light Co. v. IBEW*, 417 U.S. 790, 808–809, 94 S.Ct. 2737, 2746–2747, 41 L.Ed.2d 477, 490–91 (1974). Supervisors fired for engaging in the same activity have no remedy under the Act. *Id.*, 417 U.S. at 811, 94 S.Ct. at 2748, 41 L.Ed.2d at 492. *See also Beasley v. Food Fair of North Carolina*, 416 U.S. 653, 660, 94 S.Ct. 2023, 2027, 40 L.Ed.2d 443, 450 (1974).

■ However, as explained in *Russell Stover Candies, Inc. v. NLRB*, 551 F.2d 204, 206 (8th Cir. 1977):

[I]f the discharge of the supervisor violates section 8(a)(1) of the Act, that supervisor may be entitled to reinstatement. The supervisor is not protected in his own right—his basis for relief is that his discharge had a tendency to interfere with, restrain or coerce the protected employees in the exercise of their Section 7 rights.

Courts have used reinstatement of a discharged supervisor as a remedy sparingly and in only narrowly defined circumstances. Reinstatement has been approved as a remedy where the supervisor was discharged for refusing to aid his employer in committing an unfair labor practice, *NLRB v. Talladega Cotton Factory*, 213 F.2d 209 (5th Cir. 1954); *Russell Stover Candies*, 551 F.2d 204; where the supervisor was fired for giving testimony before the Board, *NLRB v. Southland Paint Co.*, 394 F.2d 717 (5th Cir. 1968); *Oil City Brass Works v. NLRB*, 357 F.2d 466 (5th Cir. 1966); or where the discharge of a supervisor who hired his own

---

7. See note 2, *supra*.

crew was a pretext for the termination of his pro-union crew, *Pioneer Drilling Co. v. NLRB*, 391 F.2d 961 (10th Cir. 1968).

Nothing in these cases compels the result reached by the Board. *See Big Three Welding Co.*, 359 F.2d 77. Here, the employees and supervisors lost their jobs because they chose to organize. Congress specifically decided not to protect supervisors from *precisely* this kind of conduct. As we warned in *Oil City Brass Works*, 357 F.2d at 470 (fn. omitted), "Congress has declined to protect supervisors and the courts should not do by indirection what Congress has declined to do directly." To enforce the Board's order reinstating supervisors Baker and Parker would swallow whole the Congressionally imposed exclusion for supervisors. We decline to enforce that portion of the Board's order directing their reinstatement and awarding them backpay.[8]

■ The ALJ treated as a separate violation of §§ 8(a)(1) and 8(a)(3) Gurley's refusing to rehire Huguley in November of 1977, after the business reopened. At the outset, we must conclude that the ALJ's decision is at least partially incorrect as a matter of law insofar as it finds that Gurley's refusal to rehire Huguley violated § 8(a)(1). That section prohibits an employer's interference with, or restraint or coercion of, *employees'* § 7 rights, the right to engage in "concerted activities for the purpose of collective bargaining or other mutual aid or protection." Because, obviously, Huguley was no longer an *employee* when he reapplied, he is not protected by § 8(a)(1). The only question, then, is whether Gurley's refusal to rehire Huguley rested on anti-union bias. The employer urges that if there was any discrimination, it occurred at the time of the discharge and, thus, *NLRB v. McCready and Sons, Inc.*, 482 F.2d 872 (6th Cir. 1973), and cases which agree with its principle, preclude predicating a subsequent unfair labor practice on the same employer state of mind which motivated the original discharge.

■ A violation of the Act cannot be based on a refusal to rehire where the refusal is the result of a discharge which occurred outside the limitations period "since the illegality of such refusal derives from the illegality of the initial discharge." *McCready*, 482 F.2d at 874; *NLRB v. Auto Warehousers, Inc.*, 571 F.2d 860, 865 (5th Cir. 1978).[9] Here, the refusal to hire does *not* "require an assessment of [an] earlier unlawful discharge," *Auto Warehousers*, 571 F.2d at 865, because the original termination of Huguley's employment was for a *different reason* than the refusal to rehire. Huguley's discharge on September 2nd, like that of his fellow workers, took place when Gurley closed part of Southern Plasma because he did not want to deal with a union. The refusal to rehire, in contrast, if we accept the contentions of both sides, was motivated by Huguley's poor work record and by his conduct at the September 2nd meeting. No one even contends that this is the same reason Huguley was originally dismissed. If an employer refuses to rehire

---

**8.** The General Counsel attempts to support the Board's conclusion that reinstatement of Baker and Parker was warranted by pointing out that they "played important roles in the employees' protected concerted activity. . . ." Brief for Petitioner, at 27. Thus, the General Counsel would have us hold that, although Congress chose not to protect supervisors' participation in employees' organizational efforts, discharge based on such activity violates § 8(a)(1) where the supervisors played "important roles" in the employees' concerted activities.

**9.** For purposes of analysis, it is instructive to compare a refusal to *rehire* a discriminatorily discharged employee with the refusal to *hire* an employee because he engages in pro-union activity. As explained in *NLRB v. Textile Ma-*

*chine Works, Inc.*, 214 F.2d 929, 932 (3d Cir. 1954) (emphasis in orig.): "The distinction is critical in dealing with cases involving the six month limitation provided by Section 10(b) for the following reason. A discharged employee who seeks to be *reinstated* is really litigating the unfairness of his original discharge because only if the original discharge was discriminatory is he entitled to be reinstated as if he had never ceased working for the employer. . . . The concept of a discriminatory refusal to hire is a different concept. If a person—whether a former employee or not—applies for employment and discriminatorily is refused employment on account of prior union activity, the employer has committed a separate and distinct unfair labor practice."

a former employee for conduct which did not form the basis for the original termination of the employer-employee relationship, then a finding of a violation in the refusal to rehire does not "rel[y] on an earlier unfair labor practice," *Local Lodge No. 1424 v. NLRB*, 362 U.S. 411, 417, 80 S.Ct. 822, 827, 4 L.Ed.2d 832, 838 (1960), but rather depends on an assessment of the employer's "motives . . . at the time of the refusal on which the charge is based." *McCready*, 482 F.2d at 875. Section 10(b) prevents revival of time-barred unfair labor practices; it does not foreclose events occurring outside the limitations period when they are relevant to explain the alleged violation occurring within the limitations period. *Local Lodge*, 362 U.S. at 412 & n. 6, 80 S.Ct. at 824 & n. 6, 4 L.Ed.2d at 836 & n. 6.

 We must decide, then, whether substantial evidence on the record as a whole supports the ALJ's decision that Gurley's refusing to rehire Huguley was due to anti-union discrimination. We note at the outset that Southern Plasma does not challenge the ALJ's conclusion that Huguley's conduct at the September 2nd meeting was an exercise of protected concerted activity, and thus we have no occasion to address that determination. Rather, Southern Plasma argues that the ALJ could not reject the non-discriminatory reasons Gurley asserted for refusing to rehire Huguley, *i. e.*, that he had received two prior warnings threatening termination because of violations of company rules and because he had been involved in an unpleasant incident in the donor room.

At the hearing, Gurley testified that his reference to Huguley's troublemaking was based on Huguley's conduct at the meeting, which we again note is not challenged as being protected concerted activity. Applying the "but for" test, does substantial evidence in the record support the ALJ's conclusion that the refusal to rehire was based on Huguley's having engaged in this protected activity? We think so, and conclude that the ALJ was entitled to find the donor room incident and the two prior warnings were not the motivating reason for Gurley's

conduct toward Huguley. Such explanations become suspect when the employer allows the conduct to remain undisciplined and then suddenly offers it as a reason for employee discipline. *See NLRB v. Gulf-Wandes Corp.*, 595 F.2d 1074, 1079 (5th Cir. 1979). Furthermore, the only reason advanced by Peck for the refusal to reemploy Huguley was his "troublemaking" at the meeting; prior work problems were not mentioned. *NLRB v. Georgia Rug Mill*, 308 F.2d 89, 91 (5th Cir. 1962).

In summary, we decline to enforce that portion of the Board's order granting reinstatement and backpay to supervisors Glenda Baker and Melanie Parker. In all other respects, the Board's order is enforced.

Enforcement GRANTED in part and DENIED in part.