INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 406, AFL-CIO, Petitioner-Cross Respondent,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent-Cross Petitioner.

No. 82–4230
Summary Calendar.

United States Court of Appeals, Fifth Circuit.

March 28, 1983.

Jerry L. Gardner, Jr., New Orleans, La., for petitioner-cross respondent.

Elliott Moore, Deputy Assoc. Gen. Counsel, N.L.R.B., Washington, D.C., for respondent-cross petitioner.

Before REAVLEY, RANDALL and JOLLY, Circuit Judges.

PER CURIAM:

J. Lamar Honey filed a complaint with the National Labor Relations Board (NLRB), alleging that his union had retaliated against him by committing various unfair labor practices. The case was brought before an administrative law judge, who credited testimony establishing that the union's business agent had discriminated against Honey by depriving him of employment referrals. The administrative law judge cited the union for numerous violations of the National Labor Relations Act, and the union appealed. The NLRB affirmed the Order, concluding as an additional basis of liability that the union's surreptitious change of a longstanding rule regarding employment referrals constituted an additional unfair labor practice. On appeal, we review the NLRB's decision in light of numerous contentions advanced by the union. Finding no merit in the union's contentions, we affirm the NLRB's decision and enforce the Board's Order.

## I. FACTS.

Under the terms of a collective bargaining agreement, a northeastern Louisiana local of the International Union of Operating Engineers ("the Union") maintained a pool of out-of-work union members, known as a "hiring hall," from which area employers could gain access to union labor. The hiring hall covered all job classifications traditionally included in the Union's geographical territory. Employers who entered the Union's jurisdiction seeking to employ union labor were required to sign supplemental agreements with the Union binding them to the procedures of the Union's exclusive hiring hall.

The hiring hall was designed to spread fairly the available employment opportunities among the numerous out-of-work members. The Union maintained a list of applicants, denoting each worker's name and his or her qualifications to operate various machinery. The Union's business agent, Charles "Sub" Hayes, was charged with the

responsibility of tendering employment opportunities to the list's job applicants. In standard practice, qualified laborers were referred to job openings on a first-in, first-out basis. Once an applicant was referred to a job, his name was removed from the list and would not reappear until he was once again out of work. Practical exceptions, however, were built in to the general referral procedure. Only if an applicant worked a job lasting more than five days was his name removed from the list. Short-term jobs, lasting on the average no more than one to three days, were offered to those qualified applicants present at the hiring hall when the jobs were announced. An applicant present in the hall could receive such a referral even though "outranked" on the referral list; moreover, he would not lose his priority on the list. In addition, the referral procedure allowed that a union worker who had worked for an employer within the preceding 45 days could be recalled by that employer to work a job "within the [Union's] geographical area."

In general, an employer could reject any worker referred to it by the hiring hall. Likewise, job applicants were allowed the right to refuse any proffered job. In order to retain their places on the list, the applicants routinely turned down jobs not lasting significantly longer than five days. Thus the wise strategist chose to accept short-term jobs, retaining a place on the out-of-work list while awaiting the opportunity of a long-term referral.

In February 1978 the job superintendent of Ford, Bacon & Davis Construction Company (FBD) contacted Union member Lamar Honey, a hiring hall applicant who had recently worked for the company, and requested that Honey report to a nearby FBD work site. Honey attempted unsuccessfully to contact business agent Hayes in order to obtain the requisite referral slip. Thereafter, he proceeded to the job site and began working as a "cherry picker" operator. Later, Honey succeeded in contacting Hayes, who demanded that Honey leave work and obtain the necessary form. Honey dutifully reported to Hayes, whereupon a heated argument ensued. Hayes accused Honey of "hiring over the fence," or circumventing the hiring hall's procedures. Nonetheless Hayes issued the necessary referral slip and Honey returned to the FBD site, where he continued to work his assigned job during the next three weeks.

In early March 1978 the superintendent asked Honey to do some "book work" normally associated with the "master mechanic" position. Although Honey agreed to do the work temporarily, he asked that someone else be offered the master mechanic's job. Sometime later, the superintendent requested two additional workers for the job site. Hayes sent not only the two requested men, but also a master mechanic. Upon the master mechanic's arrival at the job site, an argument took place. The superintendent ascertained that Honey did in fact want the master mechanic's job, and so retained Honey. He sent the newly-recommended master mechanic back to the Union.

Honey's refusal to resign the master mechanic's position so annoyed Hayes that he confronted Honey at the FBD site, angrily threatening to retaliate against Honey for his insubordinate actions. Stating that Honey would have to "come by [him] one day or another," Hayes vowed that he was "gonna get [Honey] sooner or later." In Honey's opinion, however, neither he nor FBD had done anything wrong. At a union meeting in late March 1978, Honey discussed the matter with the Union's business manager. The manager told Honey that he wanted him to "step down" from the position so that the Union could put a "union man" in his place and "bring the company to its knees." Undaunted, Honey adhered steadfastly to the position that neither he nor the company was "doing wrong."

Soon thereafter, Hayes once again visited Honey at the FBD site and asked him to quit the job. Honey stated that he feared FBD would fire him if he resigned the master mechanic's job. The conversation ended with Hayes' assurance that Honey would never work another master mechan-

ic's job again so long as Hayes was the Union's business agent.

Hayes did not attempt to conceal his attitude toward Honey; indeed, he remarked openly that he intended to "get even" with Honey by making sure that Honey was not referred to any jobs for some time. No fewer than four union members heard Hayes threaten to deprive Honey of employment referrals.

Honey's tenure with FBD expired in mid-February, 1980, when the company "laid him off" for lack of work. Honey returned to the Union's hiring hall and, on February 20, signed the out-of-work list. Although he repeatedly visited the hiring hall during the next three months seeking short-term jobs, he did not receive a referral. In late May, Honey approached Hayes and the two men began to argue about the hiring hall's "recall policy," which allowed a contractor to request by name employees who had worked for the contractor during the preceding 45 days. During the argument, Hayes explained that he was very irritated by Honey's refusal to step down from the master mechanic's job, and that he intended to "get even" with Honey because of it. Two weeks later Honey demanded to know why he, unlike other hiring hall applicants, was not receiving job referrals. Hayes reminded Honey that he had vowed to "get even." Further, he implied that he was using his powers as business agent in order to carry out the threats.

In mid-June, Hayes "recommended" hiring hall applicant Sherman Allen for a master mechanic's job opening at FBD, notwithstanding that Honey had seniority relative to Allen on the list. Within the next three months, Hayes referred to jobs no fewer than eight men with less "list seniority" than Honey's. Vexed by Hayes' refusal to refer him to a job opening, Honey on August 6, 1980 filed a charge of unfair labor practice with the NLRB's General Counsel. In late September, 1980, Honey was offered a six-day job; he refused the opportunity because the relatively short duration of the job militated against relinquishing his position on the out-of-work list.

In the following weeks, several more men with less list seniority than Honey's were referred to jobs.

On October 15, 1980, the Union posted a notice which indicated a change in policy. Pursuant to the notice, the names of members would be removed from the list only if their jobs lasted longer than *six* days. In fact, the policy had been in effect several weeks prior to the date on which the notice was posted. Hayes had secretly tendered six-day job offers to several men, with the tacit understanding that their acceptance would not cause their names to be relegated to the bottom of the list. Lamar Honey, among others, was not informed of the *sub rosa* change in policy. His rejection of the late-September job offer had been predicated upon an understanding that the former rule was still in effect.

In November 1980 Honey was referred to a dangerous and unhealthy job that the Union "couldn't get anybody to go out on." Honey accepted the job and worked for twenty-six days bulldozing flaming, polluted carbon black. He received no other referrals until six days prior to his administrative hearing. Honey refused the late job opportunity because he thought it would interfere with the scheduled hearing in the instant unfair labor practice action.

The hearing took place in June 1981. Upon consideration of all testimonial and documentary evidence, the administrative law judge concluded that Hayes' threats to retaliate against Honey constituted an unfair labor practice; that the Union had discriminated against Honey by the June 17, 1980 referral of another member to serve as FBD's master mechanic; and that the Union had discriminated against Honey by failing to refer him to available short-term positions with various employers. The administrative law judge found no violation, however, in the Union's covert revision of the policy regarding six-day referrals.

The Union appealed the decision to a three-member panel of the NLRB. The Board affirmed, concluding that the Union had

violated section 8(b)(1)(A) and (2) of the Act by refusing to refer Honey for employment pursuant to its operation of an exclusive hiring hall, and by informing Honey that it was denying him referrals because he had failed to comply with [the Union's] request that he relinquish a job. Furthermore, the Board ruled that the Union committed additional violations of the Act when it surreptitiously changed the five-day hiring hall rule to a six-day rule. In light of the Union's "out-of-turn referrals motivated by unlawful discriminatory animus against Honey," the Board reached the "inescapable" conclusion that the rule had been implemented as "an effective way of denying Honey subsequent referral opportunities." Because the Union had offered no convincing showing that its policy change was "necessary to the effective performance of its representative function," the Board concluded that the covert rule change violated § 8(b)(1)(A) of the Act. Accordingly, the Board ordered the Union to make restitution to Honey and enjoined it from further acts of discrimination in the administration of the hiring hall.

## II. DISCUSSION.

■ The National Labor Relations Act ("the Act") guarantees to employees not only the right to "form, join, or assist labor organizations," but also the right to "refrain from any or all of such activities . . . ." 29 U.S.C. § 157. The Act prohibits as an unfair labor practice "every practice, act, or institution which in fact is used to encourage or discourage union membership by discrimination in regard to hire or tenure, term or condition of employment." *Local 357, Int'l Brotherhood of Teamsters v. NLRB,* 365 U.S. 667, 676, 81 S.Ct. 835, 840, 6 L.Ed.2d 11 (1961). As the Act prohibits a union's direct interference with the rights of employees, it likewise prohibits a union from causing an employer to discriminate against an employee in order to encourage or to discourage union membership. *See* 29 U.S.C. § 158(a)(3) and (b)(2). In this manner the Act allows employees to "freely exercise their rights to join unions [and to] be good, bad, or indifferent members . . . ."

*Radio Officers' Union v. NLRB,* 347 U.S. 17, 40, 74 S.Ct. 323, 335, 98 L.Ed. 455 (1954).

■ A labor union is obligated to represent its members "without hostility or discrimination toward any." *Vaca v. Sipes,* 386 U.S. 171, 177, 87 S.Ct. 903, 909, 17 L.Ed.2d 842 (1967). The union's duty of fair representation guarantees employees the right to be represented without "invidious treatment . . . in matters affecting their employment." *Id.* at 177–78, 87 S.Ct. at 909–910. The Act does not prohibit a union's operation of an exclusive hiring hall; however, the union may not apply arbitrary or invidious criteria in referring employees to jobs. *NLRB v. Int'l Longshoremen's Ass'n, Local 1581,* 489 F.2d 635, 637–38 (5th Cir.), *cert. denied,* 419 U.S. 1040, 95 S.Ct. 527, 42 L.Ed.2d 316 (1974). In instances where, as here, a union is alleged to have singled out one employee for disparate treatment, an inquiry into the union's motives is essential. *Local 357, Teamsters v. NLRB,* 365 U.S. at 675, 81 S.Ct. at 839. Given sufficient competent evidence, the trier-of-fact properly may infer a discriminatory animus from the circumstances surrounding a departure from standard hiring hall procedures. *Local No. 725, Plumbers,* 225 NLRB 138, 142–43 (1976), *enf'd* 572 F.2d 550 (5th Cir.1978); *see Local 357, Teamsters v. NLRB,* 365 U.S. at 675, 81 S.Ct. at 839. In reviewing such a finding, we are constrained to determine solely whether the finding is properly supported by substantial evidence. *NLRB v. Southwestern Bell Telephone Co.,* 694 F.2d 974, 976 (5th Cir.1982); *NLRB v. Gulf States United Telephone Co.,* 694 F.2d 92, 95–96 (5th Cir.1982).

### A. Substantial Evidence.

■ Our independent review of the record creates no doubt that the critical findings of fact are adequately supported by substantial competent evidence. Because testimony diverged on several key points, the administrative law judge was required to make credibility determinations in order to establish an adequate factual background for his ultimate conclusions. Though Hayes

denied that he retaliated against Honey by discriminating in the administration of job referrals, this contention conflicted with the testimony of a number of witnesses establishing the necessary subsidiary facts from which an intent to discriminate could be inferred. The administrative law judge credited the testimony supporting Honey's allegations of union misconduct, and we must defer to his credibility determinations. *NLRB v. Gulf States United Tel. Co.,* 694 F.2d at 96; *NLRB v. Southern Plasma Corp.,* 626 F.2d 1287, 1293–94 (5th Cir.1980). The credited testimony establishes that Hayes repeatedly demonstrated a desire to retaliate against Honey for opposing him and the Union in the controversy over the FBD job; that Hayes threatened to retaliate by manipulating the short-term referral process; that Hayes did in fact utilize the short-term referral process in order to penalize Honey for causing past discord; and that Hayes surreptitiously changed the five-day rule in a successful attempt to further deprive Honey of employment. These findings and inferences are well supported by the credited evidence, and as such are unassailable. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 490–91, 71 S.Ct. 456, 465–66, 95 L.Ed. 456 (1951); *see NLRB v. Gulf States United Tel. Co.,* 694 F.2d at 95–96. Nonetheless we advance to the Union's primary contention that the established facts are incapable of supporting the Board's conclusion that Honey was the object of repeated acts of invidious discrimination.

### B. Discriminatory Animus.

The Union contends that, because out-of-order referrals were a longstanding aspect of the hiring hall's standard referral practice, no adverse inference may be drawn from Honey's lack of success in obtaining a referral. This argument is oblique; it avoids the elemental fact-finding that the Union *intended* to exclude Honey from consideration for job referrals. Therefore, it merits only brief consideration. The evidence clearly established that Honey received *no* short-term referrals over the course of many months. While Hayes may

employ discretion in tendering job referrals, his discretion must be bridled by considerations of objectivity and fairness. His practice of abandoning the list as an aid in tendering short-term referrals, coupled with his stated intention to deprive Honey of such referrals, is prima facie evidence of discrimination. The Union has articulated no alternatively valid reason why Honey was omitted from consideration. As such, it has failed to rebut Honey's prima facie case of discrimination. *NLRB v. Great Dane Trailers,* 388 U.S. 26, 33–35, 87 S.Ct. 1792, 1797–98, 18 L.Ed.2d 1027 (1967); *NLRB v. Erie Resistor Corp.,* 373 U.S. 221, 228, 83 S.Ct. 1139, 1145, 10 L.Ed.2d 308 (1963); *see NLRB v. Robin American Corp.,* 654 F.2d 1022, 1025 (5th Cir.1981), *on rehearing,* 667 F.2d 1171 (5th Cir.1982); *NLRB v. Moore Business Forms, Inc.,* 574 F.2d 835, 841 (5th Cir.1978). Accordingly, there is no merit to the first contention.

### C. The Master Mechanic's Position.

The Union's second argument is an adjunct to its first; it likewise attempts to avoid the ineluctable. The Union contends that Hayes' recommendation of Sherman Allen for the master mechanic's job did not constitute an unfair labor practice even though Allen had less "list seniority" than Honey. In support of this argument the Union alleges first, that it presented "ample explanation" why Allen was referred rather than Honey, and second, that the position is in any event supervisory and thus not covered by the Act.

We find no merit in either of these contentions. First, the Union has in fact offered no explanation why Honey was overlooked. In light of Honey's experience as a master mechanic, including his work for the very same employer to whom Allen was referred, we cannot accept the Union's bare assertion that a plausible reason supports Honey's exclusion. Second, although the master mechanic's job is supervisory and therefore not the literal subject of the Act, the Union nonetheless engaged in a practice which the Act prohibits. Under the collective bargaining agreement, the Union had a

clear right to recommend an individual to perform the job. Notwithstanding that the incident involved a supervisor's job, the Union's action was clearly in retaliation for Honey's exercise of his rights to dissent from the Union's unreasonable demands. As a longstanding union member and hiring hall applicant, Honey depended on the hiring hall primarily for nonsupervisory jobs. The effect of the Union's discriminatory act clearly carried over to intimidate Honey as a statutory employee. Therefore, the Union violated Honey's protected rights as an employee when it denied him employment in a supervisory position. *See NLRB v. Local Union No. 725, Plumbers,* 572 F.2d 550, 552–53 (5th Cir.1978), *citing Plumbers Local 137 (Homes Construction & Equipment Co.),* 207 NLRB 359 (1973). Accordingly, we find no merit in the second contention.

### D. The Surreptitious Rule Change.

■ The Union concedes that in June, 1980, business agent Hayes covertly implemented a change in the Union's posted five-day rule by allowing six individuals to retain their places on the list following acceptance of six-day jobs. Moreover, the Union does not contest the fact that hiring hall applicants were not informed of the change until October 15, 1980. The Union does find fault in the Board's finding that the change was implemented in an attempt to discriminate against Honey by depriving him of employment opportunities. Specifically, the Union contends that the change was effected for the legitimate reason of allowing employees a "better break" on the out-of-work list, thus aiding all applicants equally.

These contentions are amiss. First, the argument does not address the Board's finding that the Union violated § 8(b)(1)(A) of the Act, 29 U.S.C. § 158(b)(1)(A), when it changed the referral rule without giving timely notice to all job applicants. Second, the argument stops short of establishing any more than a pretext to invidious discrimination. Even if a *posted* rule change would arguably afford employees a "better

break" on the out-of-work list, we fail to see how job applicants would benefit from the operation of a secret rule to which they were not privy. The departure from the established rule initially allowed some applicants to retain "list seniority" over others, including Honey. Because Honey was not informed of the rule change, the result was that he was denied employment opportunities. Under the circumstances, this interference with Honey's employment was an affront to the effective performance of the Union's representative function. "[A] union which operates a hiring hall without the use of objective criteria in making referrals engages in arbitrary conduct that is violative of its duty of fair representation." *Journeymen Pipe Fitters Local No. 392,* 252 NLRB 417, 421 (1980). In light of the Union's clear predisposition toward discrimination in Honey's employment referrals, the Board fairly inferred that the rule had been silently adopted with the intention of denying Honey subsequent referral opportunities. We need not delve into that conclusion, however. Even absent an open manifestation of specific discriminatory intent, the Union violated the Act by failing to represent all employees "in a fair and impartial manner." *Id., citing International Brotherhood of Boilermakers No. 169,* 209 NLRB 140, 144–45, 150 (1974). We therefore agree with the Board's conclusion that the unannounced rule change violated the Act.

### E. Equitable Arguments.

Last, the Union makes two equitable arguments. The first argument merits only brief discussion. The Union asserts that the Board's General Counsel has long condoned the Union's practice of employing unfettered discretion in the referral of applicants to short-term jobs. As such, the General Counsel should not be allowed to argue that this longstanding policy is void as an organ of invidious discrimination. This argument, of course, avoids the heart of the Board's decision. The General Counsel has at no time alleged that the discretionary aspects of the referral process are *per se* violations of the Act. Rather, Coun-

sel has vigorously maintained that discrimination has resulted from Hayes' abuse of discretion, occasioned by his intention to harm Honey. Clearly, no prior representation of the General Counsel can in all fairness estop it from raising and advancing this allegation. The Union's position is vacuous.

 The Union's related contention is that this Court should overturn the Board's Order because the Board's General Counsel, after first refusing to issue a complaint in this matter, later reversed its decision and proceeded to issue the instant complaint. The Union's apparent position is that, in the absence of any new evidence, the General Counsel may not issue a complaint in a matter for which it has previously refused to issue a complaint. Even assuming that Honey has presented no new evidence, this argument is unconvincing. First, to the extent that the argument relies on common law res judicata or estoppel as authority for barring the issuance of the second complaint, the law is clearly contrary. *See, e.g., W. Ralston & Co., Inc.,* 131 NLRB 912, 912–13 n. 3 (1961), *enf'd* 298 F.2d 927 (2d Cir.1962); *Taylor Forge and Pipe Works,* 113 NLRB 693, 705–06 (1955), *enf'd* 234 F.2d 227 (7th Cir.), *cert. denied,* 352 U.S. 942, 77 S.Ct. 265, 1 L.Ed.2d 238 (1956). To the extent that it does not, we are challenged to articulate any legal authority which might buttress the Union's position. Fortunately, we need not elevate a creature of judicial precedent from this abyss of jurisprudence. Honey has presented substantial *new* evidence in his second complaint; this suffices to remove the matter from the argument's attenuated grasp.

The record discloses that Honey filed an unfair labor practice charge on June 20, 1980, alleging that the Union violated § 8(b)(1)(A) of the Act by refusing to refer him on three identified occasions. The charge was dismissed. In explaining the reasons for its refusal to issue a complaint, the General Counsel centered discussion around the Union's 45-day rule regarding employee "call-backs." Dismissal was predicated upon Honey's failure to show that Hayes had not "interpreted this provision in a consistent manner and applied it consistently to other employees." On August 6, 1980, Honey filed charges alleging that the Union had violated the Act by failing to refer him to employment at times subsequent to July 1, 1980. The General Counsel issued a complaint which alleged that the Union had violated the Act by committing various unfair labor practices in May and June of 1980. Thereafter, the complaint was amended to include allegations of continuing violations extending from February to December, 1980.

Clearly, the General Counsel did nothing more than investigate Honey's expanded charges and ultimately issue a complaint. Honey's separate charges of unfair labor practices were supported by independent averments of fact. As the Union's argument rests upon an assumption that both the denial and the issuance of the complaint were predicated upon identical factual allegations, it is in error. Accordingly, the Union's final argument fails to establish a basis for overturning the Board's Order. 29 U.S.C. § 153(d); *see Central Enterprises, Inc.,* 239 NLRB 1270 (1979).

The Order of the NLRB is ENFORCED.