**NATIONAL LABOR RELATIONS BOARD, Petitioner Cross-Respondent,**

v.

**GENERAL TRUCKDRIVERS, WAREHOUSEMEN AND HELPERS, et al., Respondents Cross-Petitioners.**

No. 85–4316
Summary Calendar.

United States Court of Appeals, Fifth Circuit.

Dec. 10, 1985.

Elliott Moore, Deputy Assoc. Gen. Counsel, Washington, D.C., for petitioner cross-respondent.

Lewis Unglesby, Ossie Brown, Baton Rouge, La., for respondents cross-petitioners.

Before POLITZ, GARWOOD and JOLLY, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

This case is before the court upon application of the National Labor Relations Board (the Board) pursuant to section 10(e) of the National Labor Relations Act, 29 U.S.C. § 160(e), the "Act" for enforcement of its unfair labor practice order against General Truckdrivers, Warehousemen and Helpers, Local Union No. 5, and the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (the Union). The Board found [1] that the Union had violated sections 8(b)(1)(A) and 8(b)(2) of the Act by maintaining and operating an exclusive hiring hall in an arbitrary and discriminatory manner, and by refusing, for arbitrary and discriminatory reasons, to refer to employment four named individuals, Jack Arnold, Nick Arnold, Francis Cranmer, and Milton Robison. The Board ordered the Union to make the four complainants whole for any loss of earnings suffered by them as a result of the Union's unlawful acts. Because we find substantial evidence in the record as a whole to support the Board's findings, we enforce the Board's order without prejudice to the Union to challenge the amounts of individual awards at the compliance proceeding.

I.

A.

The Union has collective bargaining agreements with various employers en-

---

**1.** The Board's order was issued on November 30, 1984, and is reported at 272 N.L.R.B. No. 214.

gaged in the construction business in the Baton Rouge, Louisiana area. The Board found that as a result of an agreement between the Union and an employer organization called Industrial Contractors Association, an exclusive referral practice was in effect between the Union and certain employers. The agreement provides that an employer about to hire employees must first give the Union an opportunity to refer applicants for the jobs. The employer is free to resort to other sources only upon the Union's failure to provide the requested employees within forty-eight, or in one case twenty-four, hours.

The collective bargaining agreement does not set out standards for the Union in making its referrals. Until March 12, 1984,[2] the Union maintained a referral book which an employee seeking referral was to sign daily, giving his name, the name of his immediate previous employer, and his last day worked. Theoretically, candidates were to be chosen for job referrals in order of out-of-work seniority, the people who had been out of work the longest having first choice of the available jobs.

In reality, however, employees frequently did not fill in the information on the last day worked and the last employer. All that the lists usually indicated was the order in which the applicants came to the hiring hall each day. When the Union agent undertook to make a referral, he would simply ask the employees present in the Union hall who had been unemployed the longest and then make a referral based upon the oral answers he received. Employees frequently lied about their last day of work, both on the referral lists and orally. The Union kept no records reflecting when people had last been referred or how long they had worked.

Douglas Partin, who served as the Union's business agent, secretary-treasurer, and business manager, had sole responsibility for referring employees to the various job sites. He admitted that telephone calls for referrals were sometimes made to se-

lected individuals who were not in the hiring hall, "[j]ust anyone that I knew we could get their phone number." Sometimes Partin considered the financial needs of the individual seeking referral, regardless of that individual's last job worked. Qualification for a particular job referral was based either upon the assertion of the individual employee or upon the business agent's personal knowledge of that individual's experience. There were no tests given by the Union to establish whether a candidate was qualified for a particular job.

On March 12, 1984, after the instant complaint had been filed, the Union established a new referral system with three referral classifications: drivers, warehousemen, and mechanics. Three separate referral lists are required to be maintained for each classification. A referral applicant under this procedure is allowed to sign only one referral list at a time and is required to indicate subclassifications for which he is qualified. Employees make their own determinations of which jobs they are competent to do. Referrals are made from the applicants present in the hiring hall who have signed the referral book, based on their out-of-work seniority. Telephone calls are to be made to applicants not in the hiring hall only after the list of those present is exhausted. As in the previous system, no training programs or tests are used to establish qualifications.

## B.

The relevant factual background to this case begins in December 1982 when a Union election was held in which Partin ran for Union secretary-treasurer. Jack Arnold, Nick Arnold, and Francis Cranmer, all Union members, supported Partin's opponent. Jack Arnold had been an assistant business agent under Partin for about a year, but resigned in December 1982 after a dispute with Partin about whether Arnold had contacted the FBI about Partin. The Arnolds and Cranmer campaigned against Partin outside the Union hall, playing a

---

**2.** The NLRB consolidated complaint in this case was issued in November 1983. The Union vol-

untarily modified its job referral system four months later.

tape recording of a telephone conversation between Cranmer and Partin's brother which insulted Partin; Partin expressed his displeasure and asked a city police officer to intervene and stop them. Partin went on to win this election and became Union secretary-treasurer.

One month later, in the course of a telephone conversation, Partin told Jack Arnold that he "had to go against" Jack because Jack had gone against him. Partin later told Milton Robison that he was not going to give Jack any more work and that Jack "could starve" as far as Partin was concerned because Jack had campaigned against him. Thereafter, both Jack and Nick Arnold were unable to obtain job referrals from Partin, despite their repeated requests for work, until they, in effect, "bribed" him.

Thus, in April 1983, Jack offered to give Partin a tape recording of a conversation between Jack and the Union president in exchange for job referrals for himself and Nick. Partin accepted the tape and both Arnolds were referred by Partin to the International Paper Company (PAPCO) in Natchez, Mississippi. Jack and Nick both took a job there, but Jack later quit and offered another taped conversation to Partin in exchange for more job referrals. Partin again accepted the tape and later told Jack that he would put him to work. Partin even told Jack that he need not sign the referral list because Partin knew his phone number, but despite Jack's repeated telephone calls and visits to the Union hall, he received no more referrals until after he had filed an NLRB charge in this case. At that point, in November or December 1983, Partin offered Jack a job with Stone & Webster at the nuclear power plant in St. Francisville, Louisiana, which Jack refused, allegedly because of lack of transportation. Nick Arnold, who had since been fired from PAPCO, was offered the same job but turned it down for the same alleged reason.

The situation with regard to Francis Cranmer is similar to that of the Arnolds in that he had campaigned against Partin and was not thereafter referred to jobs until he "bribed" Partin. In April 1983, after Cranmer gave Partin a tape recording of a conversation between himself and the Union president, Partin hired Cranmer as an assistant business agent for the Union. Cranmer quit this job four months later and filed a slander suit against Partin, which he later dropped. In October, after Partin had accepted another tape from Cranmer, and after Cranmer filed an NLRB charge against Partin, Partin offered Cranmer a job driving a truck at the nuclear power plant which Cranmer refused, allegedly because he felt he was unqualified for the job.

In contrast with the other three complainants, Milton Robison had supported Partin for secretary-treasurer. However, Robison had greatly embarrassed Partin the day of the election by getting "punched out" by another Union member during a public altercation regarding the campaign. There was some testimony, credited by the ALJ at trial, that Partin had a certain amount of personal animosity toward Robison and that Partin had failed to adhere to commitments he had made to Robison. From November 1982, one month before the election, until April 1983, Robison received referrals to several jobs of short duration. About May 1983, when Robison asked Partin about employment at a particular company, Partin promised him a referral, but Robison never received it. In fact Partin later told Robison that Partin had to give the job to another Union member to whom he had felt indebted. When that Union member was replaced on the job by a third individual instead of by Robison, Partin offered no explanation for the substitution. In October Robison filed an NLRB charge against the Union and Partin. Partin finally called Robison in December to offer him a referral, but Robison was not at home and did not return the call. Partin subsequently offered Robison a referral to a job at the nuclear power plant that Robison refused in February 1984.

None of the complainants has attempted to obtain job referrals through the Union

under the new post-March 12, 1984, referral system.

## II.

The complaint in this case is issued pursuant to the charges filed by each of the named complainants, and alleges that the Union operated its exclusive hiring hall in an arbitrary and discriminatory manner without regard to, and without the establishment of, any verifiable objective criteria or standards. It also alleges that the Union violated sections 8(b)(1)(A) and 8(b)(2) of the Act by failing and refusing, for arbitrary, invidious, discriminatory, and/or irrelevant considerations, to refer the four men to employment with the various employers. Following an evidentiary hearing, the administrative law judge (ALJ) found that employment referrals were made without reference to objective standards or criteria, both before and after March 12, 1984, and therefore that both systems operated in violation of sections 8(b)(1)(A) and 8(b)(2). He also found that the Union had unlawfully and discriminatorily refused to refer to employment the four individual complainants. The Union was ordered to cease and desist from operating an exclusive hiring hall and referral system in an arbitrary and discriminatory manner, to cease and desist from discriminating against the complainants, and to make the complainants whole for any loss of earnings that they may have suffered as a result of the discrimination against them. The Board affirmed the ALJ's rulings, findings, and conclusions, and adopted his recommended order.

The Union contends on appeal that the post-March 12, 1984 referral procedure does not violate the Act, stating that even though there exists a potential for subjectivity in the light of the lack of written rules, in actuality, referral decisions are based on objective criteria. In addition, the Union maintains that there was no discrimination against the four men under the pre-March 12, 1984, system. It argues instead

that the four men did not actively seek referrals "and in fact were engaged in other activities during these periods which prevent the union from referring them."

Finally, the Union vigorously disputes the remedial part of the order that requires the four complainants to be awarded back pay. The Union makes three points on this issue: (1) no back pay should be awarded because the Union voluntarily amended its hiring hall system after the NLRB charges were filed; (2) the individuals' own acts of misconduct should preclude any back pay; and (3) even if the complainants had been referred to jobs in the absence of any illegal discrimination, there is evidence in the record that they would have rejected the valid job referrals, and therefore back pay should be denied.

The Union does not contest the Board's finding that the pre-March 12, 1984 system operated illegally.

## III.

A union serving as the exclusive bargaining representative of employees in a bargaining unit has a statutory duty to fairly represent all of those employees, both in its collective bargaining with the employer and its enforcement of the collective bargaining agreement. This statutory duty includes the duty to serve the interests of all members without hostility or discrimination, to exercise its discretion in good faith, and to avoid arbitrary conduct. *Vaca v. Sipes*, 386 U.S. 171, 177, 87 S.Ct. 903, 909–10, 17 L.Ed.2d 842 (1967). It is a fundamental principle of Board law that a breach of the union's duty of fair representation constitutes an unfair labor practice. The Board derived this duty of fair representation from the fact that section 7 of the Act, 29 U.S.C. § 157, gives employees the right to be free from unfair or invidious treatment by their exclusive bargaining agent in matters affecting their employment. *Miranda Fuel Co.*, 140 N.L.R.B. 181, 185 (1962).[3]

**3.** Although the Second Circuit denied enforcement of the Board's order in *Miranda Fuel,* it did not take a position as to whether a breach of

the duty of fair representation is an unfair labor practice. *NLRB v. Miranda Fuel Co.*, 326 F.2d 172 (2d Cir.1963). The Second Circuit finally

Although there is no explicit statutory requirement of "fair representation," the Board and the courts have declared a violation of the duty to be a violation of section 8(b)(1)(A). *Local Union No. 12, United Rubber, Cork, Linoleum and Plastic Workers v. NLRB*, 368 F.2d 12, 19–21 (5th Cir.1966), *cert. denied*, 389 U.S. 837, 88 S.Ct. 53, 19 L.Ed.2d 99 (1967). *See also Newport News Shipbuilding and Drydock Co. v. NLRB*, 631 F.2d 263, 269–70 (4th Cir.1980); *NLRB v. American Postal Workers Union*, 618 F.2d 1249, 1254–55 (8th Cir.1980); *Kling v. NLRB*, 503 F.2d 1044, 1046 (9th Cir.1975); *Asbestos Workers Local 80 (West Virginia Insulators)*, 270 N.L.R.B. 1124, 1128–29 (No. 172) (1984); *Miranda Fuel*, 140 N.L.R.B. at 185.

■ Thus, it is unlawful for a union to operate an exclusive hiring hall by discriminating among employees for arbitrary and capricious reasons. The discrimination need not be based on an individual's union activities, or lack thereof, in order to constitute a violation of the Act. 2 *The Developing Labor Law* 1400–1 (C. Morris 2d ed. 1983). The Board has held that discrimination in job referrals based on race,[4] sex,[5] or nepotism [6] violates sections 8(b)(1)(A) and 8(b)(2). In addition, referrals made without reference to objective criteria or standards are invalid. *Local Union No. 174, International Brotherhood of Teamsters (Totem Beverages, Inc.)*, 226 N.L.R.B. 690 (1976). When a union representative with sole authority over referrals operates his system arbitrarily without standards, written or otherwise, the union is in violation of sections 8(b)(1)(A) and 8(b)(2).[7] Thus, a union has the duty to refrain from classifying applicants on an arbitrary basis where such

arbitrary conduct affects the employment status of applicants whom the union is expected fairly to represent. *Asbestos Workers Local 80 (West Virginia Insulators)*, 270 N.L.R.B. 1124, 1129 (1980).

■ On review, we must decide, on the basis of the record as a whole, whether substantial evidence, *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), supports the Board's findings that the Union violated section 8(b)(1)(A) and 8(b)(2) of the Act by maintaining an exclusive hiring hall whereby employment referrals were made arbitrarily and discriminatorily both before and after March 12, 1984, and by refusing, for arbitrary and discriminatory reasons, to refer Robison, Cranmer, and the two Arnolds for employment. Where the Board's conclusions are reasonable, it is irrelevant that a different result might also be reasonable. *NLRB v. Gulf States United Telephone Co.*, 694 F.2d 92 (5th Cir.1982). In determining whether the Board's decision is supported by substantial evidence, we must also consider evidence which might detract from the Board's decision. *Universal Camera Corp.*, 340 U.S. at 488, 71 S.Ct. at 465.

### IV.

#### A.

After an evidentiary hearing, the ALJ found that the Union had violated section 8(b)(1)(A) of the Act prior to March 12, 1984, by operating an exclusive hiring hall without reference to objective standards or criteria. *See Polis Wallcovering Co.*, 262 N.L.R.B. 1336 (1982), *enf'd in relevant*

decided this issue in 1984, holding that a union may be found to have engaged in an unfair labor practice by breaching its statutory duty of fair representation within the requirements of section 8(b)(1)(A). *NLRB v. Local 282, International Brotherhood of Teamsters*, 740 F.2d 141 (2d Cir.1984).

**4.** *Painters Local 1066*, 205 N.L.R.B. 651 (1973).

**5.** *Pacific Maritime Association*, 209 N.L.R.B. 519 (1974).

**6.** *Asbestos Workers Local 80 (West Virginia Insulators)*, 270 N.L.R.B. 1124 (1984).

**7.** In *Local Union No. 174*, the union agent responsible for referrals testified, "If you're asking whether or not I have written standards or any other kind of standards, no, most of them are in my head." 226 N.L.R.B. at 699. The Board found a violation of sections 8(b)(1)(A) and 8(b)(2). *See also Local 519, International Brotherhood of Teamsters*, 276 N.L.R.B. No. 94 (1985).

*part,* 717 F.2d 805 (3d Cir.1983). The ALJ also found that the Union had violated section 8(b)(2) of the Act prior to March 12, 1984, by actually practicing discrimination in the operation of this hiring system. *See Local Union No. 174,* 226 N.L.R.B. at 700.

▮ The conclusion that the pre-March 12, 1984, referral system was unlawful is strengthened by the fact that the Union has not challenged these findings to the Board or to this court on appeal. We agree with the Board that it is entitled to summary enforcement on this issue. *See, e.g., Gulf States Manufacturing v. NLRB,* 704 F.2d 1390, 1396–97 (5th Cir.1983).

### B.

▮ With respect to the post-March 12, 1984, referral system, the Union argues that the Board was incorrect in finding that the system violated section 8(b)(1)(A) of the Act.[8] The Union admits that the system has no written procedures for how referrals are to be made after one of the lists is exhausted, and recognizes that this lack of written procedures creates the potential for subjective treatment. The Union states on appeal only that "this potential was never actually realized and no discrimination was ever present." We find much more persuasive the Board's argument that to the extent referral under the new hiring hall arrangement is based on Partin's personal knowledge of the individuals' qualifications and circumstances, the selection of which applicants to refer is entirely subjective and tends to favor Union members over nonmembers. Although the Act does not prohibit a union's operating an exclusive hiring hall, *Local 357, International Brotherhood of Teamsters v. NLRB,* 365 U.S. 667, 675–76, 81 S.Ct. 835, 839–40, 6 L.Ed.2d 11 (1961), the union may not apply arbitrary or invidious criteria in referring employees to jobs. *International Union of Operating Engineers Local 406 v. NLRB,* 701 F.2d 504, 508 (5th Cir.1983) (per curiam). There is evidence in the record that the Union has mailed to all Union members a copy of its new written rules relating to referrals. The Board found, however, that there still exist unwritten irregular procedures which are within the "unfettered discretion" of a business agent to use or not. When the unwritten procedures supplant the written rules, operation of the referral system becomes subjective. Thus, the Board properly found that the post-March 12, 1984, referral system violates section 8(b)(1)(A) of the Act. *See Local Union No. 174,* 226 N.L.R.B. 690.

### C.

▮ Concerning the finding of individual discrimination, the ALJ found, and it was reasonable to so find, that "there was deep and abiding animosity between Part[ ]in and Cranmer" and that Partin's treatment of the Arnold cousins stemmed from their involvement in the 1982 campaign against Partin. The ALJ also found that although Robison had supported Partin, Robison was treated discriminatorily in the referral system. The treatment received by the four men "establishes ... Partin's arbitrary exercise of unfettered and whimsical discretion in the operation of the referral system." The Union does not contest on appeal the ALJ's finding that the pre-March 12, 1984 hiring hall system was illegal. Rather, the Union contests the finding that it discriminated against these individuals, and argues that the Board's conclusion that the Union failed to offer these men jobs because of internal Union politics and personal animosity is erroneous. The Union, however, fails to refute the findings of discrimination, merely alleging that Jack Arnold should not have quit his PAPCO job "until the problems between him and Partin had subsided"; that there was no discrimination against Nick Arnold because Nick had turned down a job offer for lack of transportation; that Cranmer "only signed the referral sheet once" and that he should not have turned down the job at the power plant; and that Robison did not have the "intent to work or to even make him-

---

**8.** The Board found no evidence of actual discrimination after the new system was put into effect and therefore found no violation of section 8(b)(2) in this regard.

self available for work." We find these arguments unpersuasive with respect to whether the Union unlawfully discriminated against these individuals in the operation of the hiring hall, and uphold the Board's decision as to the four complainants.

### D.

Finally, we reach the issue of whether the Board's remedial order of back pay for the four complainants is within its discretion. Back pay was ordered for the four men for "any loss of earnings they may have suffered by reason of the discrimination against them," to be computed according to Board formula set forth in *F.W. Woolworth Co.*, 90 N.L.R.B. 289 (1950) and in *Florida Steel Corp.*, 231 N.L.R.B. 651 (1977). The Union contends that even if discrimination occurred, no back pay should be awarded because (1) the Union set up on objective referral system on March 12, 1984, (2) the individual complainants "participated in acts of misconduct" by receiving subjective referrals, and (3) all four men have rejected one or more job referrals for various reasons.

■ We have already considered and rejected the Union's first argument by finding that the post-March 12, 1984 referral system was not an objective one. We note, however, that even if this referral system were not violative of the Act, that fact would be irrelevant to a determination of back pay for events prior to that date. The Union's second argument is also rejected: the complainants are not charged with any misconduct, and we will not, as a matter of all-inclusive legal principle, preclude back pay to union members and employees for accepting jobs that are offered to them under irregular circumstances.

■ The Union's third argument with respect to back pay does have some merit but raises an issue that must be left to compliance stage of this proceeding. If the

complainants rejected valid opportunities for employment, then the amount of wages that they could have earned at those jobs should be taken into account in the Board proceeding that will determine the amount of their back pay awards. For example, the excuse that Nick and Jack gave of "no transportation" in rejecting their job referrals to the St. Francisville nuclear power plant was possibly given in bad faith, while the referral offer was a valid one.[9] We also note that Nick resigned his PAPCO job after only a few months of work; this too may be considered by the Board in the compliance proceeding. Under these circumstances, these referrals may be considered in mitigating the Union's back pay obligation. The Board similarly noted that the referral offered to Cranmer to the truck driving position in late 1983 was a valid one which also may influence the Union's back pay liability. Finally, we note the weakness of Robison's back pay entitlement. Robison's refusal to return Partin's December 1983 telephone call and his failure to accept the February 1984 referral may serve to mitigate his back pay award.

■ Thus, we agree with the ALJ that the Board's determination of back pay due each complainant should take into account any interim net earnings as well as any rejection of job referrals that the ALJ found to be valid offers by the Union, the awards being diminished accordingly. We are mindful that the open-ended nature of the Board's remedy leaves a potential for abuse. Although certainly grants of back pay are authorized under the Act, they are not to be punitive. *NLRB v. Strong*, 393 U.S. 357, 359, 89 S.Ct. 541, 543, 21 L.Ed.2d 546 (1969). Any award or group of awards which has the effect of crippling the Union may, in some cases, not effectuate the purposes of the Act, and the Board should keep this consideration in mind. *United Association of Journeymen v. NLRB*, 747 F.2d 326, 333 (5th Cir.1984).

**9.** The ALJ found that the referral was valid and that since Nick Arnold owned a car, he and Jack

could have teamed together for transportation.

We enforce the Board's order requiring a "make whole" remedy for the discriminatees. The Board must articulate its reasons for allowing or disallowing back pay in the compliance proceeding. The Union may contest individual awards and compliance procedures.

### V.

In conclusion, the Board's decision and order is affirmed in all respects.

ENFORCEMENT GRANTED.