MILLWRIGHT & MACHINERY ERECTORS, LOCAL UNION 720, UNITED BROTHERHOOD OF CARPENTERS & JOINERS OF AMERICA, Petitioners, Cross-Respondents,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent, Cross-Petitioner.

No. 85–4648.

United States Court of Appeals, Fifth Circuit.

Aug. 27, 1986.

■■■■■■■■■■■■■■■■

Jerry L. Gardner, Jr., Metairie, La., for petitioners, cross-respondents.

Marc B. Seidman, Elliott Moore, N.L.R.B., Deputy Assoc. Gen. Counsel, Washington, D.C., for respondent, cross-petitioner.

Joseph G. Norton, Act. Dir., New Orleans, La., for other interested parties.

Before GEE, POLITZ, and GARWOOD, Circuit Judges.

GARWOOD, Circuit Judge:

Millwright and Machinery Erectors, Local Union 720 (the Union) petitions this Court to review and set aside an order of the National Labor Relations Board (NLRB or the Board) finding that the Union violated section 8(b)(1)(A) of the National Labor Relations Act (NLRA), 29 U.S.C. § 158(b)(1)(A), in its treatment of Union member Leland H. Johnson, Jr. The NLRB cross-petitions for enforcement of its order. Because the Union conduct at issue was purely a matter of internal union discipline and did not facially, and was not shown to actually, have any effect on Johnson's employment, we find that the NLRB erred in finding a section 8(b)(1)(A) violation based only on the manner in which the discipline was imposed. Accordingly, we set aside the order and remand to the NLRB.

### Facts and Proceedings Below

The Union operates a hiring hall providing an exclusive referral system for the employment of millwrights in the greater Baton Rouge, Louisiana area. The Union referral system, which is open to union and nonunion members alike, provides for the maintenance of two lists. The master list assigns to each hiring hall participant a sequential number, which is retained until that individual is referred to a job lasting five or more days. When a worker takes such a job, he or she obtains a new, higher master list number. The daily list, or out-of-work list, is signed each morning by those interested in job referrals. Those who sign on Monday are on the out-of-work list for the week (unless they accept a job referral) and need not appear at the hall again that week. The jobs are offered to those on the out-of-work list, beginning with the person having the lowest master list number and continuing in the ascending order of the master list numbers. Hiring hall participants are permitted to turn down job referrals; a declined referral is then offered to the next eligible individual on the out-of-work list. Those with low numbers and a history of unemployment often turn down short jobs (provided they are longer than five days) because at the completion of the short (though over five days) job they must re-register on the master list, losing their low number and corresponding opportunity for a longer job.

On September 10, 1984, Leland H. Johnson, Jr., a member of the Union, signed the out-of-work list. The next day, Union Business Representative Joe Wade Bennett, who administers the referral system, offered Johnson a job with a union company—a company that had signed a collective bargaining agreement with the Union. Johnson declined the referral, choosing to retain a job he had been working for two months with a nonunion company. At that point, Bennett threatened to file internal union charges against Johnson for declining a union job while working for a nonunion company.

On September 14, 1984, Bennett filed union disciplinary charges against Johnson [1] and announced to the members at a Union meeting that the charges had been filed. The Union Trial Committee conduct-

---

1. Bennett charged that Johnson was guilty of (1) causing dissension among Union members and (2) violating "the Obligation"—the Union member's promise of allegiance to the Union. Johnson was found not guilty of the dissension charge, but guilty of violating the Obligation.

ed a trial on the charges and found Johnson guilty of violating his Union "Obligation." The Union membership voted to fine Johnson $500 and to suspend his membership book. Johnson paid a $50 bond to appeal the decision to the International Union. The Union has not implemented the fine or the suspension.

On October 17, 1984, after Bennett filed the charges but before the Union trial, Johnson brought this unfair labor practice claim against the Union. The General Counsel issued a complaint alleging that the Union had violated section 8(b)(1)(A) of the NLRA in its treatment of Johnson. The case was tried before an administrative law judge (ALJ) on January 9 and 11, 1985. The ALJ found that Bennett was not unlawfully motivated in his actions, but that the Union violated the NLRA by processing charges against Johnson without providing proper notice of its new policy to file charges against members who decline job referrals while signed on the out-of-work list and working for a nonunion company.[2] In support of his decision, the ALJ found that the Union, by past practice, had condoned its members' rejection of union job referrals while working for nonunion companies. The ALJ also determined that the charges against Johnson deviated from past practice, and that the membership was not informed of the new policy until after charges had been filed against Johnson. A panel of the NLRB agreed that the Union had violated the NLRA in its referenced treatment of Johnson. The NLRB affirmed the ALJ's rulings, findings, and conclusions with modifications that are not relevant here, but issued its own order.

### Discussion

The NLRB's finding of a section 8(b)(1)(A) violation is conclusive if supported by substantial evidence in the record as a whole. *United Association of Journeymen, Local No. 198 v. NLRB*, 747 F.2d 326, 330 (5th Cir.1984); *International Union of Operating Engineers Local 406 v. NLRB*, 701 F.2d 504, 508 (5th Cir.1983). An adequately supported NLRB determination will not be displaced on review, even if we would prefer a different decision on a *de novo* review. *United Association of Journeymen*, 747 F.2d at 330–31. The credibility determinations by the ALJ, at least where sustained by the Board, are to be given special deference. *Operating Engineers*, 701 F.2d at 508–09; *NLRB v. Gulf States United Telephone Co.*, 694 F.2d 92, 96 (5th Cir.1982).

Section 7 of the NLRA, 29 U.S.C. § 157, guarantees employees the right to engage or refrain from engaging in concerted activities for the purpose of collective bargaining.[3] Section 8(b)(1)(A), 29 U.S.C. § 158(b)(1)(A), makes it an unfair labor practice for a labor organization "to restrain or coerce" employees in the exercise of their rights guaranteed by section 7: "*Provided*, That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein." The Supreme Court has held that the federal labor laws impose on a union, in acting as an exclusive bargaining representative, a statutory duty to fairly represent all workers in the bargaining unit, which includes the duty to treat all such workers without hostility or discrimination, to exercise its discretion with good faith and honesty, and to avoid arbitrary conduct. *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 909–10, 17 L.Ed.2d 842 (1967). A breach of this duty of fair representation constitutes a violation of section 8(b)(1)(A).

---

**2.** The ALJ found that the Union acted unlawfully by threatening to file charges against Johnson, filing charges, informing members of the charges, processing the charges, trying him on the charges, finding him guilty, and imposing discipline.

**3.** Section 7 of the NLRA, 29 U.S.C. § 157, provides in part:

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities ...."

*NLRB v. General Truckdrivers,* 778 F.2d 207, 212–13 (5th Cir.1985). However, the Supreme Court has determined that the proviso to section 8(b)(1) "leaves a union free to enforce a properly adopted rule which reflects a legitimate union interest, impairs no policy Congress has imbedded in the labor laws, and is reasonably enforced against union members who are free to leave the union and escape the rule." *Scofield v. NLRB,* 394 U.S. 423, 89 S.Ct. 1154, 1158, 22 L.Ed.2d 385 (1969).

We have interpreted the duty of fair representation to mean that a union operating an exclusive hiring hall "may not apply arbitrary or invidious criteria in referring employees to jobs." *Operating Engineers,* 701 F.2d at 508 (citation omitted); *accord General Truckdrivers,* 778 F.2d at 213. In *Operating Engineers,* we held that the union violated section 8(b)(1)(A) when it changed its hiring hall procedures to permit members to take six-day jobs without forfeiting list seniority by not informing a member who declined a six-day job in reliance on the prior five-day rule. 701 F.2d at 510. Because the union member was "denied employment opportunities," the union's conduct interfered with the performance of its representative function: the union failed to "represent all employees 'in a fair and impartial manner.'" *Id.* (citations omitted). Similarly, in *General Truckdrivers,* we enforced an NLRB order finding that a union violated section 8(b)(1)(A) in the operation of its exclusive hiring hall when, in an arbitrary and capricious manner, it failed to refer employment to the complainants. 778 F.2d at 213–15.

The Union argues that its conduct is protected by the proviso to section 8(b)(1)(A) as internal union discipline not affecting Johnson's employment. The Union claims that, unlike the unlawful union conduct in *Operating Engineers* and *General Truckdrivers,* its actions only affected Johnson's status as a member of the Union. The NLRB argues that the Union's treat-

ment of Johnson affected his employment. In addition, the NLRB contends that, even if the rule did not affect his employment status, it was not "properly adopted," nor was it "reasonably enforced." Johnson was not "free to leave the union and escape the rule," because he was disciplined before he had the choice of compliance. Thus, the NLRB reasons, the Union conduct was not protected according to the Supreme Court's interpretation of the proviso. *See Scofield,* 89 S.Ct. at 1158.

The NLRB argues that the Union's sanctions were "employment related," because they "adversely impacted on Johnson's ability to work for nonunion contractors." [4] However, Johnson's status as an employee was not affected by Union discipline imposed for his failure to accept the union job on September 11, because he kept the nonunion job. When he turned down the job offered by Bennett, Johnson retained his master list number, his place on the out-of-work list, and his full hiring hall privileges. The potential effect of the new rule on Johnson's subsequent job choices is not at issue. Neither the NLRB nor the ALJ addressed the substantive validity of the rule, but each instead merely found that the Union's internal discipline of Johnson without notice of the rule change prior to his refusal of the union job violated section 8(b)(1)(A). We therefore must determine whether the internal Union sanctions in this case may constitute a violation of the NLRA based on the absence of proper notice of the rule change.

Although the Supreme Court has stated repeatedly that Congress did not intend section 8(b)(1)(A) to regulate internal union affairs, the Court has indicated instances in which internal union sanctions may violate this provision. The Court's opinions suggest two general areas in which the union's discretion regarding internal matters may be limited by section 8(b)(1)(A): (1) when the union adopts a rule that does not reflect a legitimate union interest or impairs

---

**4.** Neither the Board nor the ALJ found that the Union's discipline of Johnson affected his em-

ployment or employment opportunities.

a policy that Congress has embedded in the labor laws; or (2) when a union rule is not "properly adopted" or "reasonably enforced." *Scofield*, 89 S.Ct. at 1158. *Cf.* R. Gorman, *Labor Law* 677–85 (1976). The Board in this case declined to answer the question whether the new Union rule "reflects a legitimate union interest or whether it frustrates an overriding policy which 'Congress has imbedded in the labor laws.'" The ALJ opinion adopted by the Board indicates that its finding of a violation is based on the fact that the rule was not "properly adopted," and not on a finding that the absence of notice here contravenes policies that inform the labor laws. Therefore, we must address the Supreme Court's indications that the manner in which a union enforces its internal regulations may violate the NLRA.

In *NLRB v. Allis-Chalmers Manufacturing Co.*, 388 U.S. 175, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967), the Supreme Court considered whether a union fine against members who crossed the union's picket lines to work during a lawful strike constituted a violation of section 8(b)(1)(A). Having carefully examined the legislative history of the provision, the Court concluded that "Congress did not propose any limitations with respect to the internal affairs of unions, aside from barring enforcement of a union's internal regulations *to affect a member's employment status." Id.*, 87 S.Ct. at 2014 (emphasis added).[5] The Court thus held that the union may enforce reasonable fines against its members for crossing authorized picket lines. Yet, the Court cautioned that it expressed no view on whether "§ 8(b)(1)(A) proscribes arbitrary imposition of fines, or punishment for

disobedience of a fiat of a union leader." *Id.* at 2014.[6]

The Supreme Court in *Scofield* held that the imposition of reasonable union fines on members for violating a union rule relating to production ceilings was not subject to challenge based on section 8(b)(1)(A). Because the rule was aimed at a legitimate union interest and did not contravene any policy of the NLRA, and because it was enforced solely through internal union mechanisms not affecting employment, the Court found that its enforcement "by reasonable fines" did not constitute the restraint or coercion prohibited by section 8(b)(1)(A). 89 S.Ct. at 1161. However, the Court observed that there was "no showing in the record that the fines were unreasonable or the mere fiat of a union leader, or that the membership of petitioners in the union was involuntary. Moreover, the enforcement of the rule was not carried out through means unacceptable in themselves, such as violence or employer discrimination." *Id.* at 1158.

In determining whether the language in *Allis-Chalmers* and *Scofield* supports the NLRB's argument that the Union's unreasonable and arbitrary imposition of internal discipline violates the NLRA, we find some guidance in the Supreme Court's opinion in *NLRB v. Boeing Co.*, 412 U.S. 67, 93 S.Ct. 1952, 36 L.Ed.2d 752 (1973). In *Boeing* the union had called a lawful economic strike against the employer upon the expiration of their collective bargaining agreement. After the dispute was resolved and a new agreement signed, the union attempted to enforce fines against members who had crossed the picket lines. The employer

---

5. The Court relied on the repeated assurances by the sponsors of the bill that this section was not meant to regulate the internal affairs of unions. 87 S.Ct. at 2009–14. Although Senator Taft suggested that Congress should be concerned about arbitrary union conduct, the Court concluded that any inference that Senator Taft envisioned section 8(b)(1)(A) as regulating internal union affairs was negated by "his categorical statements to the contrary in the contemporaneous debates on § 8(b)(2)." *Id.* at 2012. The Court also reasoned that the adoption of the Landrum-Griffin Act in 1959, "thought to be the

first comprehensive regulation by Congress of the conduct of internal union affairs," *id.* at 2013, indicated that Congress did not intend such regulation when it adopted section 8(b)(1)(A) in 1947. *Id.* at 2013–14.

6. In a dissent joined by three other justices, Justice Black concluded that the judicial enforcement of union fines for refusal to join the strike was "restraint or coercion" of those employees' section 7 right to refrain from joining in concerted activities. 87 S.Ct. at 2016.

filed a charge with the General Counsel, claiming that, although the members were validly fined by the union, the fines were unreasonable in amount. In appealing the Board's ultimate rejection of its claim, the employer argued that the Supreme Court's language in *Allis-Chalmers* and *Scofield* was intended to suggest that unreasonable fines would amount to a section 8(b)(1)(A) violation. *Id.*, 93 S.Ct. at 1955.

The Supreme Court concluded that, although the employer's interpretation was not illogical, it was based only on dicta because in both *Allis-Chalmers* and *Scofield* the reasonableness of the fines was assumed. *Id.* at 1955. The Court continued:

> "Being squarely presented with the issue [of unreasonable fines] in this case, *we recede from the implications of the dicta in these earlier cases....* The underlying basis for the holdings of *Allis-Chalmers* and *Scofield* was not that reasonable fines were non-coercive under the language of § 8(b)(1)(A) of the Act, but was instead that those provisions were not intended by Congress to apply to the imposition by the union of fines *not affecting the employer-employee relationship and not otherwise prohibited by the Act.* The reason for this determination, in turn, was that Congress had not intended by enacting this section to regulate the internal affairs of unions to the extent that would be required in order to base unfair labor practice charges on the levying of such fines." *Id.* at 1956 (emphasis added).

The Court referred to the construction of the legislative history of this provision in *Allis-Chalmers* and *Scofield,* reasoning that the Board's inquiry in the case before it into matters such as the union's motivation for imposing a fine involved the Board in internal union affairs in a manner that the Court had held Congress did not intend. *Id.* at 1956. The Court also relied on the Board's longstanding view that assessment of the reasonableness of union fines should be left to the state courts. *Id.* at 1956–58. The Court adopted the Board's conclusion that "when the union discipline *does not interfere with the employee-employer relationship* or otherwise violate a policy of the National Labor Relations Act, the Congress did not authorize it 'to evaluate the fairness of union discipline meted out to protect a legitimate union interest.'" *Id.* at 1958 (footnotes omitted) (emphasis added).

 The NLRB does not challenge the reasonableness of the amount of the fine against Johnson, but instead asserts that the unreasonableness of imposing Union discipline without notice of the rule change violated the NLRA. We believe that the Court's opinion in *Boeing* suggests that we should not rely on the language in *Scofield* and *Allis-Chalmers* urged by the NLRB to support the Board's determination that the Union violated the Act because its rule was not "properly adopted." If Congress did not intend section 8(b)(1)(A) to proscribe internal union discipline (not affecting the disciplined member's employment) even in the form of an unreasonably large fine, it is not likely that Congress intended the provision to regulate the manner in which a union imposes internal sanctions. The Supreme Court's reiteration that Congress did not intend section 8(b)(1)(A) to reach internal union matters which do not affect the member's employment, as well as the Court's statement in the context of a challenge to the reasonableness of a fine that it recedes from any contrary implications raised by its previous decisions, lead us to reject the Board's argument. Furthermore, we are unable to discover any decisions that find internal union discipline not affecting employment to be a violation of the NLRA solely on the fact that the union rule was not "properly adopted" or "reasonably enforced," without consideration of whether the union policy reflects a legitimate union interest or impairs federal labor policies.[7] We thus conclude that the

---

7. Of course, all union discipline which concerns a union member's employment-related activities may affect the member's employment status or employee-employer relationship *in the sense* that the employee threatened with or coerced by such discipline may be or feel compelled to

Union's discipline of Johnson for violating the new Union rule does not constitute a violation of the NLRA merely because he had not received notice of the rule change.

The Union contends that because the Labor-Management Reporting and Disclosure Act of 1959 (Landrum-Griffin), 29 U.S.C. § 411(a)(5), provides safeguards against improper disciplinary actions by unions, the NLRA is not the proper avenue for any relief that Johnson may be afforded. Although this argument is supported by the Supreme Court's interpretation of the legislative history of section 8(b)(1)(A) in *Allis-Chalmers, see* note 5, *supra,* it is closely related to the question of whether the Union's conduct contravened any policy that "Congress has imbedded in the labor laws." *Scofield,* 89 S.Ct. at 1158.

The NLRB and several courts have followed the Supreme Court's lead in *NLRB v. Industrial Union of Marine & Shipbuilding Workers,* 391 U.S. 418, 88 S.Ct. 1717, 20 L.Ed.2d 706 (1968), in finding a

section 8(b)(1)(A) violation when union discipline not affecting employment impairs policies underlying the NLRA. *See, e.g., NLRB v. Stationary Engineers, Local 39,* 746 F.2d 530, 533–35 (9th Cir.1984) (union violated section 8(b)(1)(A) by disciplining members who crossed unlawful picket lines); *NLRB v. Retail Clerks Union, Local 1179,* 526 F.2d 142, 145–47 (9th Cir. 1975); *cf. NLRB v. Local No. 18, International Union of Operating Engineers,* 503 F.2d 780, 782–83 (6th Cir.1974); *Amalgamated Meat Cutters, Local 593,* 237 NLRB 1159 (1978). In *Marine Workers,* the Supreme Court found a violation of this provision based on the union's expulsion of a member who filed with the General Counsel an unfair labor practice against the union without first exhausting the available union remedies. The Court determined that, although this section does not interfere with internal union affairs concerning legitimate union interests, it does not permit a union to discipline a member

*choose* between the desired employment-related activity and maintenance of membership or good standing in the union; but so long as maintenance of (or failure to maintain) membership or good standing in the union does not itself actually or potentially affect the worker's employment status or employee-employer relationship, then the referenced necessity for choice should not alone suffice to render the union discipline such as affects the member's employment status or employee-employer relationship within the necessarily implied meaning of that concept as employed in *Boeing, Allis-Chalmers,* and *Scofield. Cf. International Union of Elevator Constructors Local Union No. 8 v. NLRB,* 665 F.2d 376, 379 (D.C.Cir.1981) (stating that the proviso to section 8(b)(1)(A) "has been interpreted to allow enforcement of union rules with a legitimate purpose, which do not conflict with national labor policy, *so long as members are free to escape union discipline by resignation*" (emphasis added; footnote omitted)). We also believe that this comports with the NLRA's recognition of unions as essentially private organizations generally having the right to regulate their own internal affairs other than by use of their power to control employment (a somewhat different approach, however, having been taken in the Landrum-Griffin Act). Our analysis here is, however, contrary to that in *NLRB v. International Longshoremen's and Warehousemen's Union, Local 13,* 581 F.2d 1321, 1323 (9th Cir.1978), *cert. denied,* 440 U.S. 935, 99 S.Ct. 1279, 59 L.Ed.2d 493 (1979). Nevertheless, we note that in that case the discipline itself—or-

dering the union member *not to use the hiring hall,* effectively not to work, for ten days—directly affected the member's employment status; where the penalty is a fine, the union member has the option of discharging the penalty without affecting his employment status, while if the penalty is missing work, it cannot be discharged without affecting employment. The decision appears to have been interpreted in that manner, being cited in *Carpenters Union Local No. 25 v. NLRB,* 769 F.2d 574, 581 (9th Cir.1985), for the proposition that "a union may not be able to enforce its internal regulations in a manner which affects a member's employment status." Further, in the case presently at bar, the retroactive application of the rule—the only thing that the Board or the ALJ passed on, as they left open whether the rule could be prospectively applied to Johnson or anyone else—necessarily presents a situation where the member was not in fact faced with a choice between union membership (or discipline) and a particular work opportunity, such a choice (at least when directly imposed *as* union discipline) being what the Court found objectional in *International Longshoremen's and Warehousemen's Union, Local 13.* Consequently, while we are inclined to a different view than that expressed in *International Longshoremen's and Warehousemen's Union, Local 13,* even were we to follow the approach of that case it would not change the result here.

for seeking to enforce his rights under the NLRA concerning a matter beyond the internal affairs of the union. 88 S.Ct. at 1722. The Supreme Court in *Boeing* reaffirmed its position that when union discipline violates a policy of the NLRA, it is an unfair labor practice under section 8(b)(1)(A). 93 S.Ct. at 1958.

Although the Union conduct in the present case, unlike that in *Marine Workers*, does not invoke policies necessary to the enforcement of the NLRA, it may perhaps be arguable that other—non-NLRA—labor policies should be considered. In *Carpenters Local Union No. 22 (Graziano Construction Co.)*, 195 NLRB 1 (1972), the Board observed that under *Scofield* it must consider the full panoply of congressional labor policies in determining the legality of a union fine. The Board determined that the union conduct in that case frustrated policies embodied in the Landrum-Griffin Act. The Board concluded that, although it is not charged with the administration of the Landrum-Griffin Act, its policies should be considered in assessing the requirements of section 8(b)(1)(A) of the NLRA.

■ We do not address the issue whether the Union's treatment of Johnson may impair policies embedded in the labor laws because the Board did not reach the issue in its determination and does not discuss it on appeal. Whether policies other than those embodied in the NLRA may properly be considered by the Board in this type of case, and if so to what extent, and whether any such policies are applicable in this case are difficult questions, which we leave to the Board's determination in the first instance, subject to appropriate judicial review. In addition, the Board did not decide whether the rule itself impairs any labor policies or supports a legitimate Union interest. We therefore remand the case to the NLRB for further consideration.

### Conclusion

Because the NLRB based its finding of a violation of section 8(b)(1)(A) only on its determination that the Union rule was not properly adopted, we **SET ASIDE THE ORDER** and **REMAND** the case to the NLRB.