550 So.2d 1352 (1989)
Melvin J. WYNNE and Charles D. Jett
v.
NEW ORLEANS CLERKS AND CHECKERS UNION, LOCAL 1497, INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL-CIO, et al.
No. 88-CA-2561.
Court of Appeal of Louisiana, Fourth Circuit.
October 12, 1989.
Rehearing Denied November 15, 1989.
*1353 Bruce C. Waltzer, Michael G. Bagneris, Waltzer & Bagneris, New Orleans, for plaintiffs/appellees.
Leonard A. Washofsky, Melanie A. Leavitt, Washofsky, Angelico & Credo, Metairie, for defendants/appellants.
Before SCHOTT, C.J., and KLEES and LOBRANO, JJ.
LOBRANO, Judge.
New Orleans Clerk and Checkers Union, Local 1497 of the International Longshoremen's Association AFL-CIO (the union) appeals the district court judgment awarding $60,000.00 each to Melvin Wynne and Charles Jett, plaintiffs in this breach of contract case. This matter was tried before a jury which held that a contract existed and was breached by the union. The New Orleans Steamship Association (NOSSA), also a party defendant, was exonerated from all liability. No appeal was taken from their dismissal and thus they are no longer a party to this action.
The union is an unincorporated association which represents the clerks and checkers who work the New Orleans waterfront. NOSSA is an unincorporated association representing various employers in the Port of New Orleans. These two associations have negotiated several collective bargaining agreements regulating employment on the waterfront. Among other things, those agreements provide that a clerk may be placed on a permanent roster by an employer who may employ that person without referral from the union. Once placed on a roster, a clerk can be removed only for good cause or because of a reduction of the work force, or termination of business by the employer.
Prior to 1975, the plaintiffs were members of the freight handlers' union, Local 854. Both were classified in the "A" status because of their longevity and work history. An "A" status entitled them to preferential job placement over the "B" and "C" status employees.
In 1971 and 1973 class action suits were filed in the Federal District Court for the Eastern District of Louisiana against Local 1497 (the Union) alleging that their employment practices were discriminatory. (These suits were subsequently consolidated.) Specifically it was alleged they refused to allow blacks the more lucrative jobs as clerks and checkers. At that time the union was predominantly white. Wynne and Jett were among the plaintiffs in that federal suit. In June of 1975 a consent decree was proposed to compromise and settle the discrimination suit. However, prior to obtaining court approval of the compromise, Wynne and Jett withheld their consent. Their primary objection was that all the plaintiffs would be given a "C" status with the union, whereas they felt their longevity as freight handlers entitled them to an "A" status, the same as they had with local 854. At that time they were represented by Mr. John Dorsey.
In an effort to get unanimous consent to the compromise agreement, Dorsey and his clients met with Victor Hess, the union attorney, and James McCleland, the union president. As a result of this meeting, the *1354 union agreed to have Wynne and Jett placed on permanent rosters with employers in return for their consent to the compromise. Being placed on a permanent employer roster was even more advantagous than being given "A" status with the union because it meant job stability and permanency with a specific employer. Wynne and Jett agreed to this arrangement, and the agreement was confirmed by letter dated June 18, 1975 from Victor Hess to John Dorsey. The letter was also signed by John McCleland. It states:
"Dear Mr. Dorsey:
This letter is written to confirm an oral understanding between our clients; namely, Mr. McCleland of ILA Local 1497 and Messrs. Jett and Wynne.
In consideration of Messrs. Jett and Wynne agreeing to the settlement agreement in the above captioned case, Mr. McCleland commits himself to seeing that Mr. Jett and Mr. Wynne are placed on regular rosters.
In the event Mr. McCleland fails or refuses to obtain regular roster positions for Messrs. Jett and Wynne then, in that event only, you may use this letter in the above captioned matter to see whatever relief your clients are entitled to. If however Messrs. Jett and Wynne are placed on regular rosters, this letter is to remain in your file and neither it nor copies of it are to be given to anyone including your clients.
 Very truly yours,
 Victor Hess, Jr."
This agreement was approved by Mr. Dorsey on behalf of plaintiffs. The consent decree was signed by the federal judge the same day. As a result, Jett was placed on the roster of James Stevedores on June 23, 1975. He remained on the roster until June 8, 1979 when that employer went out of business. On September 10, 1975 Wynne was placed on the roster of regular clerks at Waterman Steamship Line. He remained there until October 1, 1980 when Waterman ceased stevedoring operations and canceled its entire roster of clerks.
On June 18, 1982, this action was filed. Plaintiffs allege that the union breached the terms of its agreement, thus entitling them to damages.
First, the union argues that the contract is unambiguous and that there was no breach since they did fulfill their promise to get plaintiffs on permanent rosters. Second, they argue that the contract does not require lifetime employment to plaintiffs and the evidence fails to prove this. Third, they argue that the contract is one for employment that has an indefinite term, and is thus void as a matter of law, citing Article 2746 of the Civil Code. This argument is also the basis for their exception of no cause of action and directed verdict, both of which were denied by the trial court. And finally, they argue that plaintiff failed to prove damages.
Plaintiffs argue that the agreement is a compromise of the federal litigation and that the parties intended its term to be substantial. They suggest the ten year provision of Article 167 is applicable.
Without considering the arguments of either party, we decide this case pursuant to our authority to "render any judgment which is just, legal and proper upon the record on appeal." La.C.C.Pro. Art. 2164. We hold that the cause and object of the agreement sought to be enforced is illegal and contrary to the public order. It is an absolute nullity, is void ab initio and can have no effect.
"It is a fundamental principle that laws existing at the time a contract is entered into are incorporated into a contract and form a part of the contract as though expressly written therein." Board of Commissioners v. Dept. of Natural Resources, 496 So.2d 281 (La.1986) at 294. The pertinent articles of the Civil Code in effect in 1975 provide:
Article 1892
"That is considered morally impossible which is forbidden by law, or contrary to morals. All contracts having such an object are void."
*1355 Article 1893
"An obligation without a cause, or with a false or unlawful cause can have no effect."
Article 1895
"The cause is unlawful, when it is forbidden by law, when it is contra bonos mores (contrary to moral conduct) or to public order."

Article 1986 (in part)
"By the cause of the contract, in this section, is meant the consideration or motive for making it."
Article 2031
"Every condition of a thing impossible, or contra bonos mores (repugnant to moral conduct) or prohibited by law, is null and renders void the agreement which depends on it."
Much of the jurisprudence interpreting the above codal articles involves contracts which have traditional immoral objects, such as prostitution, gambling and illegal drug paraphernalia. See, Martin v. Seabaugh, 128 La. 442, 54 So. 935 (1911); J.R. Watkins Co. v. Brown, 13 La.App. 244, 126 So. 587 (1930); Rosenblath v. Sanders, 150 La. 882, 91 So. 252 (1922); A Better Place, Inc. v. Giani Inv. Co., 445 So.2d 728 (La. 1984). However, our courts have also interpreted the phrase "contrary to public order" to mean a violation of a state statute. That is, if a contract has as its cause or its object circumvention of state law, it will be held an absolute nullity in contravention of the public order.
In Morse v. J. Ray McDermott and Co. Inc., 344 So.2d 1353 (La.1977) the court held that an agreement which prevented an employee from recovering under his employer's Supplemental Compensation Plan was against public order or policy citing La.R.S. 23:634, the legislative prohibition against wage forfeiture. The Court reasoned that the statute expressed the public policy of the state.
In Bamber v. Mayeux, 232 La. 42, 93 So.2d 687 (1957) the court held that a contract for an amount in excess of a federally guaranteed loan to be paid to a building contractor was in violation of the Servicemen's Readjustment Act and could not be enforced.
In Succession of Humes, 467 So.2d 25 (La.App. 1st Cir.1985) writ denied, 472 So.2d 914 (La.1985), the court held that a contract employing a non-attorney to perform services in violation of La.R.S. 37:213(2) (the unauthorized practice of law statute) had as its cause an unlawful purpose and therefore was unenforceable. See also, Gray v. Atkins, 331 So.2d 157 (La.App. 3rd Cir.1976), writ denied 334 So.2d 433 (1976).
In the instant case the letter of June 18, 1975 evidences an agreement to compromise the federal litigation. The record convinces this court that the cause[1] of the agreement is to give plaintiffs preferential treatment in job placement in order to dispose of the Title VII litigation against the union. The reason plaintiffs agreed to the consent decree was the promise by the union that it would see "that Mr. Jett and Mr. Wynne are placed on regular rosters." The plaintiffs and their attorney testified that they were concerned with job security. McCleland, the union's president, and Victor Hess, the union's attorney, admitted they were aware of plaintiffs' concerns. McCleland testified that as business agent for the union he would see that plaintiffs were given regular roster positions.
As noted earlier in this opinion, the bargaining agreement in existence at the time did not give the Union the authority to place one of its members on a regular *1356 roster. This was left to the discretion of the employers. The evidence shows that the only means in which the union could fulfill its promise was to exert influence on the employers to give preferential treatment to plaintiffs. We are of the opinion that this is illegal and constitutes an unfair labor practice.
Section 8(b)(1) and (2) of the National Labor Relations Act [28 U.S.C. 158(b)(1) and (2)] provides in pertinent part:
"(b) Unfair Labor Practices by Labor Organization. It shall be an unfair labor practice for a labor organization or its agents.
(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in Section 7 [29 U.S.C. 157]:
* * * * * *
(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3) ..."
A union has a statutory duty to represent all its members fairly and without discrimination. N.L.R.B. v. Gen. Truckdrivers, Warehousemen and Helpers, 778 F.2d 207 (5th Cir.1985). Truckdrivers also states that unlawfully discriminating hiring practices exists where referals are based upon race and where they are "made without reference to objective criteria or standards." Id. at p. 213. See also, Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1961), and the cases cited therein. This duty of fair representation is founded in Section 8(b) of the N.L.R.A. cited above. Both the union and the employer may be in violation of Section 8(b)(2) "when, for arbitrary or irrelevant reasons or upon the basis of an unfair classification, the union attempts to cause or does cause an employer to derogate the employment status of an employee." Vaca, supra at 386 U.S. 178, 87 S.Ct. at 910 citing Miranda Fuel Co., 140 N.L.R.B. 181 (1962) at 186, enforcement denied, 326 F.2d 172 (2nd Cir.1963).
Although the Vaca case was a jurisdictional case dealing primarily with the question of whether a state court could pre-empt the N.L.R.B. on the question of whether a union breached its duty of fair representation, we are satisfied that the statutory obligations of the union with respect to treatment of its employees are accurately described in that decision. Those obligations were cited and applied in N.L.R.B. v. Gen. Truckdrivers, Warehousemen and Helpers, supra.
Applying those principles to the facts of this case we are convinced that fulfillment of the promise made by the Union would be considered an unfair labor practice. Whether the union actually coerced or influenced an employer's decision on whom to hire is not the issue. The issue is they promised to exert their influence for that purpose. By doing so they would not only violate Section 8(b)(2), but would also discriminate against the other members of the union in violation of Section 8(b)(1)(A).
This court will not enforce a contract the cause and object of which is to violate the nation's labor laws. We will not judicially sanction such an agreement. Accordingly we hold that it is an absolute nullity and can have no effect.
REVERSED AND RENDERED.
NOTES
[1] Acts 1984, No. 331, effective January 1, 1985 revised, and in some instances, completely rewrote the Code Articles dealing with conventional obligations. Former article 1896 (cited above) defined cause in terms of consideration or motive. Present Article 1967 defines cause as the reason one obligates himself. Much has been written concerning the difference in terminology and meaning. See, Comments to Article 1967; Litvinoff, Still Another Look At Cause, 48 La.L.R. 3; Litvinoff, Obligations, 6 La.Civil Law Treatise (1969). We believe that, in this case, irrespective of which definition is applied cause is the same.