**28**

John Edmund LAWSON, Jr., Plaintiff,

v.

M. Peter McPHERSON, Administrator, Agency for International Development, Defendant.

Civ. A. No. 82–2683.

United States District Court, District of Columbia.

June 9, 1986.

Order and Judgment Oct. 15, 1986.

J. Forrest King, Washington, D.C., for plaintiff.

Ronald S. Robins, Asst. U.S. Atty., Civ. Div., Washington, D.C., for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

FLANNERY, District Judge.

This matter came before the court at a trial held on February 3—February 10, 1986. Having heard oral argument of counsel on April 14, 1986, and having reviewed the entire record herein, the following Findings of Fact and Conclusions of Law are entered this 6th day of June, 1986.

*Findings of Fact*

1. Plaintiff, Dr. John Edmund Lawson, Jr., a white male, has been employed by defendant Agency for International Development (hereinafter "AID") since 1973, first as a Social Science Analyst and then (since 1976) as a GS–14 Statistician/Demographer, in what is currently known as the Bureau for Science and Technology, Office of Population. Tr. 2, 3, 7; Def. Ex. 23.

2. Dr. Lawson holds B.A., M.A., M.P.H., Ph.D., and J.D. degrees. Tr. 2–3; Def. Ex. 23.

3. Plaintiff challenges defendant's selection of Dr. Sarah Clark, a white female, to the position of Division Chief of the Office of Population. Dr. Lawson and

three others, including Dr. Clark, had been interviewed for the position for which Dr. Clark was selected in January, 1981. Pl. Ex. 9.

4. On November 12, 1978, defendant agency detailed Dr. Clark, who was then a GS–13, into the GS–15 position as Division Chief of the Office of Population. Tr. 7, 109–110; Pl. Ex. 7 at p. 3. Although Office of Personnel Management (OPM) guidelines prohibit details of more than 120 days, Dr. Clark remained in that detail for over two years before her formal, permanent selection to the position. Pl. Ex. 7, 9, 31. In fact, the detail had never received OPM's prior approval; a retroactive request for the detail was made only at or near the time the 120 days had passed. At best, therefore, Dr. Clark's detail was valid only through July 24, 1979. *Id.*

5. Dr. Clark was neither qualified nor eligible for this GS–15 position at the time of the detail: an employee must have at least one year of experience in the next lower grade before she is eligible for promotion to the higher grade. Tr. 231–232, 725; Pl. Ex. 8. At the time of the detail, Clark was a GS–13. Tr. 551. She was not promoted to the GS–14 level until August 1979, almost a year after her detail began. Tr. 368, 552. She would not have been eligible, therefore, for the position until August, 1980, almost two years after she was detailed into the position.

6. Defendant's contention that when Dr. Clark's detail ended in July, 1979, she was transferred back to a regular position in the policy division, is not supported by the record. First, a memo from the AID personnel office dated September, 1980, states that no such action was documented in Dr. Clark's personnel file. Pl. Ex. 7 at 3. Second, although Dr. James Brackett would have been her supervisor and Dr. Clark's rater for performance evaluation purposes had such a transfer occurred, Dr. Clark's performance evaluation for the period November, 1978, through December 31, 1979, indicates that Patricia Baldi and Joseph Speidel were, in fact, her supervisors who rated her during that period. Def. Ex. 18.

7. Similarly, defendant's contention that the detailing was only meant to be temporary since the agency had recruited an outside candidate (Dr. Gayl Ness, a professor at the University of Michigan) for the position, is without merit. As testified at the trial and as stated by defendant's counsel at oral argument, that recruitment process, done under the Intergovernmental Personnel Act, would have required at least a year to process. Further, Dr. Ness had stated that he would be unable to assume the position until mid–1980, the end of the academic year. Thus, it should have been known that Dr. Ness could not have been hired within 120 days—the maximum possible detail—and defendant should have rotated the detail among other qualified individuals in the office.

8. On August 26, 1980, and coincidentally two weeks after Dr. Clark became time-in-grade eligible for promotion to the GS–15 level, defendant agency completed a staffing pattern action request (SPAR) which began the process for filling the position as division chief. Def. Ex. 7.

9. On December 5, 1980, the position was advertised. Tr. 11, 626; Pl. Ex. 8. The evidence indicated that the evaluation or selection criteria were prepared by Dr. Clark. Tr. 11, 20–21, 110, 218A, 228A; Def. Ex. 9. Dr. Clark's preparation of the selection criteria unfairly created the strong possibility that the criteria would track her qualifications and thus enhance her chance of being selected.

10. Four candidates applied for and were certified as "best qualified" for the position, including Dr. Lawson. A fifth employee requested reassignment to the position. Pl. Ex. 9.

11. The record contains ample evidence that strongly indicates that the selecting official, Joseph Speidel, preselected Dr. Clark for the position. Two of the interviewed candidates, plaintiff and a Mr. Cornelius, testified that, during their interviews, Speidel stated that Dr. Clark had done an excellent job. Tr. 12, 53–55, 215A–216A. During Cornelius' interview Speidel also stated that Cornelius should not be disappointed if he did not get the position.

Tr. at 215A. Further, prior to Speidel's completing *all* the interviews, two persons observed an organizational chart which had Dr. Clark's name pencilled in as division chief, at Speidel's secretary's desk. While it is true that anyone could have written Dr. Clark's name in, the fact that it was placed there, taken with all the other indications of irregularity surrounding the selection process, is a strong indication of pre-selection. In addition, the court notes that the dates of Dr. Clark's selection and the date Speidel signed the promotion certificate, appear to have been altered. *See* Pl. Ex. 9. In addition, the court notes that no interview time is listed next to Dr. Clark's name on the certificate although interview times were listed for all other interviewees. Pl. Ex. 9. Such an omission, taken together with other evidence discussed above, indicates that Dr. Clark may not even have been interviewed for the position.

12. Having selected Dr. Clark for the position, Speidel forwarded the promotion certificate to the appropriate agency officials.

13. Dr. Lawson and Mr. Cornelius requested informal counseling through the AID Equal Opportunity Program alleging that Speidel had violated their civil rights by illegally discriminating against them on the basis of their sex and that Dr. Speidel's discriminatory acts illegally denied them a promotion opportunity. Tr. 13–14, 216A–217A.

14. On March 4, 1981, plaintiff and the two other "nonselected" applicants (Mr. Cornelius and Dr. Maura Brackett, a female) filed formal grievances alleging that AID management had preselected Dr. Clark, shown personal and political favoritism to her, discriminated on the basis of sex, and had engaged in prohibited personnel practices. Tr. 13–14, 16–19, 184–186, 216A–218A; Pl. Ex. 6, 11.

15. On April 15, 1981, plaintiff filed a timely sex discrimination complaint against Speidel, the selecting official, with the AID Equal Opportunity Program Office (EOP). Plaintiff's EEO complaint has never been acted on. Tr. 15; Pl. Ex. 28.

16. During the period November 1977 to December 1980, plaintiff's supervisors rated his performance as "outstanding" in each of three consecutive years. An impartial review board within AID's Office of Personnel and Management approved each "outstanding" rating. Tr. 4–7, 6–99, 223A–224A; Pl. Ex. 1.

17. In March 1981, plaintiff's supervisor recommended that he and Mr. Cornelius be given a quality step increase for their sustained, high-quality performance. Tr. 26–30, 73, 99–102, 220A–221A; Pl. Ex. 14. In January 1982, plaintiff's supervisor recommended that another co-worker, Dr. Chao, be given a quality step increase. Tr. 77–78, 105, 112–114; Pl. Ex. 24.

18. Speidel, who was also the selecting official against whom plaintiff had filed the sex discrimination complaint and the grievance, rejected the recommendation for plaintiff's quality step increase. However, Speidel did approve Mr. Cornelius' quality step increase. He also approved a quality step increase for Dr. Chao on the basis of his work to remedy problems and defects of the very same project for which plaintiff had earlier identified potential problems and for which Speidel had cited as a reason for denying plaintiff's quality step increase. Tr. 31, 37–38, 77–82, 105, 114–115, 388–390; Pl. Ex. 24, 37. Dr. Chao's quality step increase was delayed for about one year. Tr. 83–88, 136–139, 397–401; Pl. Ex. 24, 25. Defendant's claim that someone other than Speidel had approved Dr. Chao's quality step increase is contradicted by Speidel's signature on the request for Dr. Chao's quality step increase. *See* Pl. Ex. 24.

19. Speidel's rejection of plaintiff's quality step increase constituted reprisal against plaintiff for filing a sex discrimination complaint and grievance against Speidel.

20. The testimony indicated that plaintiff's performance at least equalled that of Cornelius or Chao, both of whose quality step increases were approved by Speidel. Moreover, Speidel knew that plaintiff had sought EEO counseling as early as April 17, 1981, when he responded to plaintiff's

grievance. That grievance clearly stated that plaintiff had seen an EEO counselor and that he was filing a complaint. Tr. 16, 408–414; Def. Ex. 52. Under cross examination, Speidel admitted that he would have known that plaintiff had seen an EEO counselor and was filing a complaint. Tr. 413. Speidel subsequently admitted that since he had commented on this aspect of plaintiff's grievance, he obviously had known that it was one of plaintiff's concerns. Tr. 413; Def. Ex. 52. The record also reflects that Speidel knew that plaintiff had filed an EEO complaint prior to his formal rejection of plaintiff's quality step increase. Tr. 404–414; Pl. Ex. 15, 38.

21. On July 7, 1981, plaintiff filed a timely written charge of reprisal in connection with the filing of his sex discrimination complaint and a timely formal grievance alleging that Speidel's rejection of the recommendation constituted reprisal against plaintiff. Tr. 25–26, 33–34; Pl. Ex. 26, 32, 38.

22. In September, 1981, the agency denied plaintiff's allegations and rejected his March 4, grievance in response to which plaintiff filed a timely appeal. Tr. 19–21; Pl. Ex. 19.

23. Plaintiff subsequently appealed to the Office of Special Counsel, but that office claimed that its investigation of the manner in which the position was filled did not reveal any prohibited personnel practice and that the evidence did not suggest that management officials took reprisal against plaintiff. Tr. 24–25; Pl. Ex. 32.

24. On March 4, 1982, plaintiff appealed to the Merit Systems Protection Board (MSPB), but his appeal was dismissed for lack of jurisdiction. On August 25, 1982, plaintiff filed a Petition for Review with the MSPB, but it was denied on the same ground.

25. Plaintiff has never received a final agency decision with respect to his complaint of sex discrimination or his charge of reprisal. Tr. 15.

26. There was insufficient evidence that defendant denied plaintiff travel and assigned him only to terminating projects.

### Conclusions of Law

1. Plaintiff's first cause of action is under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–16. Thus, this court has jurisdiction over this case pursuant to that statute. Plaintiff alleges that defendant discriminated against him on the basis of sex when he was not selected for a GS–15 Division Chief position on January 28, 1981.

2. To establish a prima facie case of discrimination on the basis of disparate treatment, a "plaintiff must prove by a preponderance of the evidence that he applied for an available position, for which he was qualified, and that he was rejected under circumstances which give rise to an inference of unlawful discrimination." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981); *Aikens v. U.S. Postal Service Bd. of Governors*, 460 U.S. 711, 103 S.Ct. 1478 (1983); *Ethnic Employees of Library of Congress v. Boorstin*, 751 F.2d 1405, 1416 (D.C.Cir. 1985).

3. In reverse sex discrimination cases, the male plaintiff must also show that "background circumstances support the suspicion that the defendant is the unusual employer who discriminates against the majority." *Lanphear v. Prokop*, 703 F.2d 1311, 1315 (D.C.Cir.1983), *quoting Parker v. Baltimore & O.R.R.*, 652 F.2d 1012, 1017 (D.C.Cir.1981). If he meets that requirement and also shows that he was qualified for the position in question but was rejected in favor of a member of a protected class; he has met his burden of showing rejection "under circumstances which (despite the plaintiff's majority status) give rise to an inference of unlawful discrimination." *Lanphear*, 703 F.2d at 1315, *quoting Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093, 67 L.Ed.2d 207. This Circuit has recently re-affirmed *Lanphear* in holding that such "background circumstances" existed in a race discrimination case involving D.C. firefighters where white plaintiffs showed that the city had an affirmative action plan, that both the Mayor and the

Fire Chief were black, and that there was evidence of political pressure to promote the black firefighter over the white plaintiffs. *Bishopp v. District of Columbia*, 798 F.2d 781 (D.C.Cir.1986).

4. If the plaintiff is successful, the burden shifts to the defendant to come forward with some legitimate, nondiscriminatory reason for its action. If the defendant does so—and if his evidence is credible—the burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the reasons advanced by the defendant are nothing more than a pretext for the discrimination asserted. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800–02, 93 S.Ct. 1817, 1823–24, 36 L.Ed. 668 (1976). A plaintiff may succeed in this *either* directly by persuading the court that a discriminatory reason more likely motivated the employer *or* indirectly by showing that the employer's proffered explanation is unworthy of credence. *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095. Indeed, in some cases the plaintiff's initial evidence, combined with effective cross-examination of the defendant, will be sufficient to discredit the defendant's explanation. *Id.* at 255, 101 S.Ct. at 1095.

5. This court holds that the evidence, as discussed above, indicates that plaintiff has not met his prima facie case. Although plaintiff applied for the position, was qualified and was rejected, there is no evidence which would create an inference of unlawful sex discrimination. There is evidence that defendant acted unlawfully, but no evidence, direct or circumstantial, that sex discrimination was a factor. Plaintiff failed to show that "background circumstances" supported the suspicion that defendant was the unusual employer who discriminated against the majority, white males. Thus, this case stands in contrast to the *Bishopp* decision, *supra*, in which plaintiffs showed that defendant District of Columbia had an affirmative action plan, that the Mayor and Fire Chief were minorities, and that there was political pressure to promote the minority. Thus, under the law of the circuit, the court must enter judgment in favor of defendant on plaintiff's sex discrimination claim.

6. Because the court holds that plaintiff failed to meet his prima facie case, the court need not decide whether defendant successfully established non-discriminatory reasons for selecting Dr. Clark.

■ 7. Plaintiff's second cause of action is that he has been subject to reprisal for filing a complaint of discrimination. To make out a case of reprisal, a plaintiff must show that an adverse action was taken against him after he filed a complaint alleging employment discrimination. The employer must then show a legitimate, nondiscriminatory reason for the action. The plaintiff can then demonstrate pretext by comparing "the employer's actual treatment of the particular employee with his or her actual treatment of other employees in like situations." *Williams v. Boorstin*, 663 F.2d 109, 117 (D.C.Cir.1980).

8. The evidence in the record in this case showed that Dr. Speidel, the selecting official for the position which was the subject of plaintiff's discrimination complaint, rejected plaintiff's quality step increase. That rejection occurred after Speidel was aware of the complaint of discrimination and that rejection constitutes reprisal since Speidel approved two quality step increases for employees whose quality of work was similar to plaintiff's. Thus, the court will enter judgment in favor of plaintiff and against defendant on plaintiff's claim of reprisal based on the quality step increase. As discussed above, however, plaintiff failed to prove his claim of reprisal as to travel restrictions and work assignment.

■ 9. Finally, plaintiff makes a constitutional claim. Plaintiff alleges that defendant's failure to implement its own rules in a meaningful way deprived plaintiff of a significant property interest, thereby violating his Fifth Amendment Due Process rights. However, *Bush v. Lucas*, 462 U.S. 367, 103 S.Ct. 2404, 2406, 76 L.Ed.2d 648 (1983) mandates rejection of plaintiff's constitional claim. In *Bush* the Supreme Court stated:

> Petitioner asks us to authorize a new non-statutory damages remedy for federal employees whose First Amendment

rights are violated by their superiors. Because such claims arise out of an employment relationship that is governed by comprehensive procedural and substantive provisions giving meaningful remedies against the United States, we conclude that it would be inappropriate for us to supplement that regulatory scheme with a new judicial remedy.

Because plaintiff's Fifth Amendment claim, like the First Amendment Claim in *Bush,* arises out of the federal employment relationship which is governed by comprehensive procedural and substantive provisions giving meaningful remedies, the court holds that judgment should be granted to defendant on plaintiff's constitutional claims.

### ORDER AND JUDGMENT

Having issued Findings of Fact and Conclusions of Law in the above-referenced matter, it is, by the court, this 15th day of October, 1986,

ORDERED, ADJUDGED and DECREED that Judgment is hereby entered against the defendant and in favor of plaintiff, awarding a quality step increase effective retroactively to April 1, 1981; and it is further

ORDERED that plaintiff is entitled to back pay in the amount of $7,298.32; and it is further

ORDERED that defendant will process and forward to the Government Accounting Office the necessary paperwork for the payment of the back pay award within ten days of entry of this Judgment; and it is further

ORDERED that plaintiff is not entitled to prejudgment interest on the back pay award (see *Blake v. Califano,* 626 F.2d 891, 893 (D.C.Cir.1980)); and it is further

ORDERED that plaintiff shall file a petition to support his entitlement to and the amount of attorneys' fees and costs within thirty days of the entry of this Judgment.